[No. A120903. First Dist., Div. Two. Dec. 23, 2008.]

In re H.E. et al., Persons Coming Under the Juvenile Court Law.
HUMBOLDT COUNTY DEPARTMENT OF HEALTH AND HUMAN
SERVICES, Plaintiff and Respondent, v.
A.E., Defendant and Appellant.

---

## COUNSEL

Gino De Solenni, under appointment by the Court of Appeal, for Defendant and Appellant.

Wendy B. Chaitin, Interim County Counsel, and Gena Rae Eichenberg, Deputy County Counsel, for Plaintiff and Respondent.

---

## OPINION

**LAMBDEN, J.**—A.E. (mother) appeals from dispositional orders of January 9, 2008, declaring daughters H.E. and S.E. (then ages three and one) dependents of the juvenile court and maintaining them in foster care. She claims insufficient evidence to support the court's removal and reasonable efforts findings. We reject her challenges and affirm.

### BACKGROUND

This case came to the attention of the Humboldt County Department of Health and Human Services (department) through a referral to child welfare services (CWS) from the judge in a marital dissolution action (Super. Ct. Humboldt County, No. FL070336) where the parents' bitter custody battle and accusations had raised concern for the children's welfare. The juvenile court took judicial notice of the family law case file at disposition, and we do the same at the request of the department.

Mother had filed a petition for dissolution on July 2, 2007, and the family law court ordered the CWS investigation 10 days later, asking for a report on whether the children were at risk in parental custody.

Mother's charges against father in the dissolution action were wide-ranging but included violence, drug abuse, and neglect and sexual molestation of the daughters, particularly H.E. Mother was convinced of sexual molestation because H.E. got upset when mother changed her diaper. Mother wanted sole legal and physical custody, with no contact for father, and sought restraining orders against him. Father agreed to drug testing, and repeated testing failed

to show drug use. He denied any abuse or neglect of the children, was cooperative and complained that mother was verbally abusive in front of the children, had punched him in the mouth, and would rant and rage in front of the children, upsetting them and him. He once took the children with him to a violence shelter, and mother saw this as taking them hostage. Mother charged that he had hit and beaten her but was "careful not to leave marks" because he had a criminal record.

An August 2007 CWS report to the family law court by social worker Rachel Jensen, issued after an investigation of many sources, found the allegations of physical, sexual, and emotional abuse "unfounded," but that both parents put the children at risk of emotional abuse by arguing in front of them and waging the ongoing custody battle. Father agreed to CWS voluntary services and enrolled in a parenting class; mother refused services and wanted Jensen to tell the court that father should be charged with sexual and physical abuse.[1]

An original dependency petition filed as to both children on October 2, 2007, alleged failure to protect (Welf. & Inst. Code, § 300, subd. (b)) and serious emotional damage (*id.*, subd. (c)).[2] Counsel were appointed for the children and parents, and the children were detained in foster care pending and after a detention contest where social worker Pamela Owens briefly testified.

The parents had a history of 15 prior child services referrals, two in San Diego County and then 13 more in Humboldt County. Five had been investigated, two with claims against the mother substantiated, but always with those against father either unsubstantiated or deemed inconclusive. Social worker Owens in this case reviewed all of the prior referrals, which showed mother having raised various allegations against father, such as having a violent girlfriend who threatened to kill H.E., plus emotional, physical, and sexual abuse by father.

During the investigation on this referral from the family court in September 2007, social worker Carolyn Campbell went to the home and found it difficult to converse with mother, who talked "incessantly in a 'rapid and

---

[1] We would normally assume that the juvenile court took notice of the family court file not for the truth of facts stated there, but to understand the context of the referral and that mother had raised against father some of the same unsubstantiated claims she now raised against him in this dependency case. (See generally *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3 [58 Cal.Rptr.2d 899, 926 P.2d 1085]; *Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063 [31 Cal.Rptr.2d 358, 875 P.2d 73].) However, the referral and underlying facts were also related in the juvenile court reports, the CWS report, for example, being an exhibit to the jurisdictional report.

[2] All unspecified section references are to the Welfare and Institutions Code.

pushed' manner." H.E., who was still two years old, was very active and "defiant towards her mother, slapping and scratching at her," and also hit and spat at Campbell. Despite Campbell's "constant reminders" not to discuss her sexual abuse claims in front of the children, mother "could not contain herself and stated that the father had digitally penetrated" H.E. Advised that Campbell was there to help obtain services, including counseling for the children, mother was adamant that the only counselor she wanted for H.E. was one "who specialized in child sexual abuse." She was upset that the children would be visiting with father and ranted that "his fingers are always dirty" and that "a child molester should not get to see his children." She told the girls, " '[T]his nice lady will keep you safe so daddy can't hurt you.' "

When Owens later went with four sheriff's deputies to take the children into custody, she too found H.E. violent—"hitting, kicking, slapping, and trying to bite and scratch her mother," and trying to hit and kick the deputies as well. Mother said CWS was "just like San Diego CWS," taking children "so they can be sold to people with money." The event precipitating the removal was when mother came late to pick the children up after a supervised visit with father. Campbell and father had the children in a car at the visitation center, and mother, upon seeing H.E. crying (for her father), began ranting and raving and pulling at H.E. while she was still buckled in her car seat (making the child scream), screaming that Campbell and father had made H.E. cry, and then going on "about the monster [father]" in front of the girls.

Campbell supervised mother's first postremoval visit with the children, and it generally went well, with mother refraining from negative comments about father. H.E. then grew aggressive and pushed S.E. off a slide, and when H.E. began to cry at the end of the visit, mother charged that this was because H.E. was afraid to go back to the foster home. Prior to the children's removal, mother had brought them to have supervised visits with father. A first visit went well, although mother engaged supervisor Carole Haben in a "long conversation regarding the children, their medical issues, and her personal issues." A second visit was cancelled under odd circumstances. When phoned by Haben and reminded of the visit, mother said she would not bring the children because they were ill; when Haben tried to clarify, mother loudly asked whether Haben was "threatening" her and insisted that she was not cancelling a visit since there was none scheduled. When mother brought the children in on another matter later that same day, neither child appeared to be ill. Mother reported to Haben that, "during the last visit with their father he had threatened to kill the family cat and cook it."

Then a visit between mother and the children supervised by Haben a week later ended in chaos and the visits being temporarily halted. Upon learning

that the children had oatmeal for breakfast, mother began grilling the girls on the oatmeal and the foster home. When Haben cautioned that this was inappropriate, mother yelled and grew "explosive," so that Haben had to shelter the children in a bathroom while a 911 call was made. Detailed narratives chronicle continuing accusations by mother of father sexually abusing S.E. and doing things like driving by 15 to 20 times a day tearing insulation off her trailer, and trying to have her evicted, and CWS and the foster mother abusing the girls or stealing their clothing.

Meanwhile, visits with father went well. The girls were warm toward him and exhibited no behavior suggesting sexual abuse. H.E. "was like a whole different child with her father," playing, laughing, and saying please and thank you. Father did not make accusations against mother in their presence. The foster mother reported that H.E. returned from visits with mother "agitated," yet, following visits with father, "pine[d]" for him and stood by the window looking to see if any passing vehicles were his truck.

Both parents reported American Indian heritage early in the proceedings, but efforts under ICWA (Indian Child Welfare Act of 1978; 25 U.S.C. § 1901 et seq.) ultimately revealed that the children had Wiyot Tribe heritage but were not eligible for membership. Thus no tribe intervened in the dependency. Soon after mother had her visits halted, mother sought help through the Bear River Band of the Rohnerville Rancheria. Johanna Creson, a social worker and violence coordinator there, contacted CWS workers and got mother started in a variety of services, also accompanying her to supervised visits with the children at the request of mother and CWS. Mother was not comfortable at the visits unless Creson was present. While the tribe would not be intervening, mother was eligible to receive services through the domestic violence program, and Creson helped her in that capacity, later testifying as an advocate on her behalf at disposition.

The jurisdictional report assessment was this: "[Mother] has a history of being unable to control her outbursts . . . whether the children are present or not. She appears to have no insight that it is her own actions that may be impacting her children. While she obviously loves and seeks to protect her children, she seems unable to put [their needs] above her own. [H.E.] is an aggressive and defiant toddler, much more so than other children her age. She and [S.E.] have been living through an emotional cauldron, which seems to have gotten worse since the parents' recent split. [Mother] is trying desperately to protect her children from perceived threats from the father, however[,] because she is so impacted by an as-yet undiagnosed mental disability, she has been unable to interact successfully with service providers. There is hope that she will be able to work with SW Creson, of the Rohnerville

Rancheria, and complete a psychological evaluation and comply with any medication prescribed. [¶] The father appears to be loving and bonded with his children."

On October 31, 2007, after an amended petition was filed, the parents waived their rights and submitted on the reports. The court sustained all allegations. Failure to protect (§ 300, subd. (b)) was based on the following: "b-1 The mother's willful or negligent failure to provide [H.E.] with adequate mental health care has caused the child to suffer serious harm or illness. The child exhibits aggressive behavior unusual in a child her age, and the mother has failed to secure counseling for [her]. This puts the child at risk." Serious emotional damage (§ 300, subd. (c)) was based on the following: "c-1 [H.E.] suffers from severe emotional damage as exhibited by her aggressive behavior to some adults. [She] has been observed hitting and scratching, beyond normal behavior for a child her age. The mother has incessantly reiterated claims, in the child's presence, that her father sexually molested the child. The mother may have mental health issues that interfere with her ability to provide appropriate care." Further, and incorporating the facts stated in c-1: "c-2 [S.E.] is at substantial risk of suffering from severe emotional damage as a result of the mother's mental health issues that interfere with her ability to provide appropriate care."

Disposition was initially set for November 29, 2007, but ultimately heard as a contested matter on January 9, 2008. Much remained the same. Social worker Owens had testified at the jurisdictional hearing, also relating observations by Campbell and the foster mother that H.E. was more aggressive and assaultive than most children her age, often directing her violence against the younger sibling, and freely used profanity (but responded well to timeouts). Her behaviors were symptomatic of a child who may end up being emotionally disturbed. Mother spoke inappropriately in front of the children, despite repeated redirection, and lacked insight that this affected the children or that her behavior was causing them more trauma, emotional and even physical (like trying to pull buckled-in H.E. from the car seat). Social worker Donnie Sanches, who had since taken over the case, testified: mother still talked about father during visits; she continually told CWS that he was a danger to the girls; she insisted that the girls were being ill cared for by the foster mother; she complained of diaper rash and other things that others did not see; she persisted in allegations despite evidence to the contrary; and she complained of things like a "rug burn" H.E. got by falling into a cloth recliner chair and the foster mother "starving" the girls. Sanches was in almost daily phone contact with mother, who continued to exhibit hysteria. H.E. continued to exhibit concerning behavior, and the girls would be at substantial risk of continued emotional damage if returned to mother.

Apparently new was that H.E. began saying something to the effect that father had hurt her "pee-pee." Sanches deemed the report's reliability "suspect" in that mother spoke habitually to H.E. about being sexually abused. Still, since one of H.E.'s reports was overheard by a supervisor during a visit when mother was not talking about it (yet was "increasingly hysterical"), Sanches decided to investigate through a "SART exam" (unexplained in the record). This effort came to naught because, when Sanches sought mother's consent, mother said she would agree only if she could be present during the exam. Sanches felt that this might unduly influence H.E.'s statements to nurses during the exam.[3]

Creson testified and spoke positively of mother's visits and progress. Creson was present at the visit where H.E. spoke of father hurting her "pee-pee," and explained that H.E. made the statement to mother while mother was feeding her a bottle. Mother also told Creson that father was forcing her to have sex, in violation of a restraining order.

The report described father as "easygoing," having a healthy and shared bond with the children, committed to regaining their custody, but still trying to establish a suitable home. He had bought a 36-foot trailer but needed to repair and find a safe place to park it. He denied any molestation or seeing or speaking to mother outside of court, although mother had recently said that he took her to a pregnancy test. Mother claimed that she was due in August 2008 and was " 'threatening' to miscarry."

The girls were healthy and happy in foster care, developmentally on track, and generally getting along well together. Mother's visits were inconsistent, and she continued having a difficult time not discussing molestation, father and the case during her visits. H.E. did not want to visit her and returned from visits angry, fussy, combative, and having "nightmares about monsters." Visits with father, by contrast, were consistent; both girls looked forward to them and returned happy, without problems. The maternal grandparents sought visits, and social worker Sanches supported allowing them supervised visits. (This was apparently despite concern that the foster mother, a confidential placement, had received mail "from someone in San Diego that is affiliated with [mother]" that caused her concern for the safety of her family and children in her charge.)

Neither parent testified at the disposition. The court declared dependency, adopted case plans for reunification for each parent, required each to undergo

---

[3] Creson testified that mother dated the asserted molestation as July 12, 2007, months earlier, when father had taken the girls to a shelter. The parents had separated after that, and visits with father since the girls' removal on August 28, were supervised except just preceding the dispositional hearing, which would have been after H.E. spoke out on this matter. Father explained that he had gone to the shelter for safety, afraid that mother was out of control.

a psychological evaluation, and retained the children in foster care, making removal findings of danger from return and reasonable efforts. It ordered the grandparent visitation, and father's counsel conveyed an expectation that his client could "move towards family maintenance" within 60 days.

Mother appeals the disposition, an appealable judgment (§ 395, subd. (a)(1); *Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1018 [32 Cal.Rptr.3d 89, 116 P.3d 550]), as to both children. Father has not appealed.

## DISCUSSION

### *Removal Finding*

■ Removal of a child from a parent's custody requires a finding, by clear and convincing evidence, of at least one circumstance set out in subdivision (c) of section 361, including (c)(1): "There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody. . . ." The court here made a rephrased finding to that effect,[4] but mother invokes *In re Isayah C.* (2004) 118 Cal.App.4th 684 [13 Cal.Rptr.3d 198] (*Isayah C.*), to argue lack of substantial evidence in that there was no risk of "physical" as opposed to "emotional" harm. We find the removal order to be supported.

*Isayah C.*, authored by Justice Ruvolo while a member of our division, noted some unclarity in section 361, subdivision (c)(1) (subdivision (c)(1)), because: "Its first clause authorizes removal based on a 'substantial danger' *either* to the minor's 'physical health,' *or* to the minor's 'safety, protection, or physical or emotional well-being.' Its second clause, however, appears to limit removal to situations in which removal is necessary to protect the minor's 'physical health,' without mentioning the minor's 'emotional well-being.'" (*Isayah C., supra*, 118 Cal.App.4th at p. 697.) Reasoning that allowing risk of emotional harm alone to suffice would render "superfluous" a removal ground, in section 361, subdivision (c)(3) (subdivision (c)(3)), for extreme emotional damage,[5] *Isayah C.* stated that subdivision (c)(1) required "a threat to physical safety, not merely emotional well-being, in order to

---

[4] The court's oral finding, similarly phrased in the ensuing written order, was: "[I] find by clear and convincing evidence that return of the child to the mother or father would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the children, [H.E.] and [S.E.]"

[5] Subdivision (c)(3): "The minor is suffering severe emotional damage, as indicated by extreme anxiety, depression, withdrawal, or untoward aggressive behavior toward himself or

justify removal." (*Isayah C.*, at p. 698.) Mother reads this to mean that a risk of emotional harm is never enough alone under subdivision (c)(1), and requires reversal here.

One flaw in her view, however, is that, were we to accept her broad reading of *Isayah C.*, our record supports an alternative finding under subdivision (c)(3)—that "[t]he minor is suffering severe emotional damage, as indicated by extreme anxiety, depression, withdrawal, or untoward aggressive behavior toward himself or herself or others . . . ." (Fn. 5, *ante*.) The parties debate whether we should *imply* such a finding, but there is no need to imply one. Both parties overlook a further *express* finding which, while reciting some *jurisdictional* facts, also mirrors the subdivision (c)(3) removal language. That finding states: "The facts on which the decision to remove the child are based [(citing § 300, subds. (b), (c)):] The mother's willful or negligent failure to provide [H.E.] with adequate mental health care *has caused the child to suffer serious harm or illness*, putting the minor at risk. [¶] [*H.E.*] *suffers from severe emotional damage*[] *as exhibited by her aggressive behavior to some adults* . . . ." (Italics added.) Thus as to H.E., any arguable error in relying on subdivision (c)(1) for removal is cured by the further express finding. Mother also does not claim lack of support for the further order or its recitation of jurisdictional facts.

The parties' briefing does not distinguish between the children, but further analysis of removal is needed as to S.E, who was not yet two years old. The further finding as to her does not speak of *existing* emotional damage, but of being "*at risk* of suffering from severe emotional damage as a result of the mother's mental health issues" (italics added), language of subdivision (c)(1) rather than subdivision (c)(3). This returns us to *Isayah C.*

Mother concedes that mere *risk* of emotional harm is enough to justify jurisdiction (§ 300, subd. (c)), but contends that, after *Isayah C.*, it is never enough to justify removal unless there is also a risk of *physical* harm. The department counters that, to the extent the statutory language is unclear, mother's construction conflicts with a Judicial Council rule interpreting subdivision (c)(1) as allowing removal for risk of emotional *or* physical harm (Cal. Rules of Court, rule 5.695(d)(1)),[6] which is entitled to judicial deference and was never considered in *Isayah C.* We agree with, and expand upon, the department's position.

---

herself or others, and there are no reasonable means by which the minor's emotional health may be protected without removing the minor . . . ."

[6] All further rule references are to the California Rules of Court.

Rule 5.695(d)(1) allows removal for clear and convincing evidence that "[t]here is a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child, or will be if the child is returned home, and there is no reasonable alternative means to protect that child . . . ."

We first revisit *Isayah C.*'s concern that to construe subdivision (c)(1) as allowing "removal based on a danger only to the minor's 'emotional well-being' " would render "superfluous" subdivision (c)(3)'s severe-emotional-damage ground. (*Isayah C., supra*, 118 Cal.App.4th at p. 698.) It would not. Subdivision (c)(1) concerns a "danger" (i.e., risk) of emotional harm, whereas subdivision (c)(3) (fn. 4, *ante*) concerns *already caused* emotional harm. This was not considered in *Isayah C.*, no doubt because, as the opinion reveals, the agency had not briefed *any* issues under subdivision (c), focusing instead on a different code section (*Isayah C.*, at p. 694, fn. 10 [agency relied on § 361.2, subd. (a)]).

■ Second, *Isayah C.* did fail to consider or give deference to the Judicial Council construction of subdivision (c)(1) in rule 5.695(d)(1), which effectively allows a risk of emotional harm to suffice alone (fn. 5, *ante*). We further observe that case law has long construed section 361 as allowing removal where "return of the child would create a substantial risk of detriment to the child's physical *or* emotional well-being" (italics added) (*In re Marilyn H.* (1993) 5 Cal.4th 295, 308 [19 Cal.Rptr.2d 544, 851 P.2d 826], citing in part former § 361, subd. (b)), which anticipated the current language of subdivision (c)(1). Rule 5.695(d)(1) ("physical health, safety, protection, or physical or emotional well-being") does no more than confirm that case law construction and, of course, is also entitled to deference as a statutory interpretation. (*Sara M. v. Superior Court, supra*, 36 Cal.4th at pp. 1011–1013.)

Third, the ambiguity noted in *Isayah C.* is less baffling in light of its statutory evolution. Before 1996, the provision was codified in former section 361, subdivision (b)(1), and made no mention of emotional well-being, stating only that the court must find: "There is a substantial danger to the physical health of the minor or would be if the minor was returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parents' or guardians' physical custody. . . ." (Stats. 1992, ch. 382, § 2, p. 1471.) As already noted, case law had assumed that removal was justified by a "risk of detriment to the child's physical or emotional well-being" (*In re Marilyn H., supra*, 5 Cal.4th at p. 308), and a 1996 amendment essentially amplified that assumption by allowing removal where: "There is a substantial danger to the physical health, *safety, protection, or physical or emotional well-being* of the minor or would be if the minor was returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parents' or guardians' physical custody. . . ." (Stats. 1996, ch. 1139, § 8.5, pp. 8145–8146, additions italicized.)

■ The resulting ambiguity lies in the failure of the 1996 amendment to modify the rest of the compound sentence so that it might read (our suggestion italicized), "and there are no reasonable means by which the minor's physical *or emotional* health can be protected without removing the minor . . . ." This failure leaves an inconsistency, but the words actually added by the Legislature show an intent to clarify or broaden the language and, presumably, to allow removal consistent with that modification. Otherwise, the added words are meaningless, contrary to our starting assumption "that every part of a statute serves a purpose and that nothing is superfluous." (*In re J. W.* (2002) 29 Cal.4th 200, 209 [126 Cal.Rptr.2d 897, 57 P.3d 363].) "It is fundamental that legislation should be construed so as to harmonize its various elements without doing violence to its language or spirit. Wherever possible, potentially conflicting provisions should be reconciled in order to carry out the overriding legislative purpose as gleaned from a reading of the entire act. [Citation.] A construction which makes sense of an apparent inconsistency is to be preferred to one which renders statutory language useless or meaningless. [Citation.]" (*Wells v. Marina City Properties, Inc.* (1981) 29 Cal.3d 781, 788 [176 Cal.Rptr. 104, 632 P.2d 217].) Mother offers, and we see, no explanation for the Legislature's added words, unless they clarify or broaden the grounds for removal. A construction that allows removal for substantial risk of emotional harm alone, on the other hand, is consistent with the legislative intent and therefore prevails over rendering the amending language meaningless. (*California Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 18 [270 Cal.Rptr. 796, 793 P.2d 2].) It would also be unfortunate in this case, where the court found that behavior by mother had already caused serious emotional harm to one daughter, to deprive the court of the ability to protect the younger sibling from the same behavior, until actual harm developed.

■ Finally, mother makes too much of *Isayah C.*'s pronouncement that subdivision (c)(1) requires risk of physical, not just emotional harm. "Language used in any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered. [Citation.]" (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689].) "The holding of a decision is limited by the facts of the case being decided, notwithstanding the use of overly broad language by the court in stating the issue before it or its holding or in its reasoning. [Citations.]" (*McGee v. Superior Court* (1985) 176 Cal.App.3d 221, 226 [221 Cal.Rptr. 421].) A close look at *Isayah C.* reveals that, notwithstanding its broad pronouncement, the case presented neither proof, allegations, nor contentions about emotional harm. We therefore limit the holding to an unremarkable deduction that, where the subdivision requires risk of emotional *or* physical harm and there is no risk of emotional harm, there must be risk of physical harm. (*PLCM Group, Inc. v. Drexler* (2000) 22

Cal.4th 1084, 1097 [95 Cal.Rptr.2d 198, 997 P.2d 511] ["language of an opinion must be construed with reference to the facts presented by the case; the positive authority of a decision is coextensive only with such facts"].)

There were two dependent children in *Isayah C.*, only the younger, two-and-a-half-year-old Isayah, being the father's child. A longtime substance-abusing mother of three (her eldest nearly 18 and in long-term foster care from a prior dependency) did not appeal, and the younger two children had been removed from her care when she was intoxicated. (*Isayah C., supra*, 118 Cal.App.4th at pp. 688–689.) The appellant father was a nonoffending parent who had completed reunification with Isayah in the prior dependency and been awarded joint custody of him, although he no longer lived with the mother when this second dependency arose. In the new dependency, Isayah was placed with the father until the father was jailed on accusations made by the mother. Jurisdiction over Isayah as to the father had been based solely on his being temporarily jailed (yet never charged) (§ 300, subd. (g)), and that allegation was *dismissed* by the time of disposition. (*Isayah C.*, at pp. 688–696.) There was "no evidence, and the trial judge did not find, that placing Isayah with [the father] (or his relatives in Redding) would pose any threat whatsoever to Isayah's physical health or safety" (*id.* at p. 697); the only perceived detriment, alluded to by the trial court but with no finding, was the prospect of separating Isayah from a foster care home he shared with a seven-year-old half brother (*id.* at p. 697).

On those facts, *Isayah C.* found it error not to have made findings about Isayah living temporarily with the father's relatives, or the adequacy of the father's efforts in that regard. (*Isayah C., supra*, 118 Cal.App.4th at pp. 693–694, 698–699; see also *In re V.F.* (2007) 157 Cal.App.4th 962, 970–973 [69 Cal.Rptr.3d 159].)[7] In that context, the opinion stated that subdivision (c)(1) "require[d] a threat to physical safety, not merely emotional well-being, in order to justify removal." (*Isayah C., supra*, 118 Cal.App.4th at p. 698.) The "not merely emotional well-being" language was a dictum unnecessary to anything presented in the case, and two cases cited as support for that notion (*ibid.*) did not support it. One case involved former

---

[7] The case has been well described this way: "[*Isayah C.*] held that the juvenile court may consider placing a child with a noncustodial, incarcerated parent under section 361.2 if that parent seeks custody of the child, the parent is able to make appropriate arrangements for the child's care during the parent's incarceration and placement with the parent is not otherwise detrimental to the child. The *Isayah C.* court based its decision on the case law that held the juvenile dependency system has no jurisdiction to intervene 'when an incarcerated parent delegates the care of his or her child to a suitable caretaker' and there is no other basis for jurisdiction under section 300. [Citation.] At disposition, the length of a parent's incarceration may be a factor in determining detriment under sections 361, subdivision (c) and 361.2, subdivision (a), but a finding of detriment cannot be based solely on the fact a parent is incarcerated." (*In re V.F., supra*, 157 Cal.App.4th at p. 971.)

section 361, subdivision (b)(1), before the 1996 addition of the "emotional well-being" language. (*In re Basilio T.* (1992) 4 Cal.App.4th 155, 169–172 [5 Cal.Rptr.2d 450].) The other did involve postamendment subdivision (c)(1) but did not hold that physical harm was always needed. It simply found inadequate support from social worker opinion that the parents had not " 'internalized' " parenting skills or understood a daughter's "teenage 'issues' " (*In re Jasmine G.* (2000) 82 Cal.App.4th 282, 288–289 [98 Cal.Rptr.2d 93]), and from social worker feelings that the parents were hostile to them and unwilling to cease all use of corporal punishment (*id.* at pp. 290–291).

In briefing perhaps—but not necessarily—based on *Isayah C.*, mother claims insufficient evidence in that no testimony from a "mental health specialist" linked H.E.'s abnormal behavior with mother's "mental illness," and she invokes case law that "[h]arm to a child cannot be presumed from the mere fact the parent has a mental illness. [Citation.] The question is whether the parent's mental illness and resulting behavior adversely affect the child or jeopardize the child's safety." (*Kimberly R. v. Superior Court* (2002) 96 Cal.App.4th 1067, 1079 [117 Cal.Rptr.2d 670].)

There are three problems with this argument. First, at the time of the disposition order we review, no evaluation had yet determined whether mother had a mental illness. Serious emotional damage allegations included that mother "*may have* mental health issues that interfere with her ability to provide appropriate care" (italics added) (c-1) and that this put the younger sibling "at risk" of severe emotional damage (c-2), but the crux of the matter was that H.E. suffered severe emotional damage, shown by physically aggressive behavior, from mother "incessantly" reiterating claims, in her presence, that father had sexually molested the child. The same allegations were incorporated into the c-2 allegation as to the younger child. Finally, the failure-to-protect allegations (b-1) did not even mention mental illness; they rested entirely on mother's failure to secure mental health care for H.E.'s aggressive behavior. Thus neither jurisdiction, nor removal, rested on a finding that mother necessarily had a mental illness. This leaves no basis to argue that removal of either child was based on "assumed" harm from a mental illness. The point was that mother's behavior, whatever the cause, had caused harm and placed the girls at risk.

Second, even if a mental illness had been established, the court did not *presume* or anticipate harm; it looked at what had actually transpired.

Third, to the extent that mother may mean to argue, notwithstanding whether she had a mental illness, that there was insufficient evidence that H.E.'s aggressiveness was caused by mother's behavior, we reject that position. Our review on appeal follows the ordinary rules for substantial

evidence, notwithstanding that the finding below had to be made by clear and convincing evidence. (*Crail v. Blakely* (1973) 8 Cal.3d 744, 750 [106 Cal.Rptr. 187, 505 P.2d 1027]; *In re Basilio T., supra,* 4 Cal.App.4th at p. 170.) Viewing the evidence in the light most favorable to the finding, and presuming in its support the existence of every fact the trier could reasonably deduce, we ask whether any rational trier of fact could have made the finding by the requisite standard. (*In re Manuel G.* (1997) 16 Cal.4th 805, 822 [66 Cal.Rptr.2d 701, 941 P.2d 880].) Mere support for a contrary conclusion is not enough to defeat the finding (*id.* at p. 823); nor is the existence of evidence from which a different trier of fact might find otherwise in an exercise of discretion (*People v. Clair* (1992) 2 Cal.4th 629, 655 [7 Cal.Rptr.2d 564, 828 P.2d 705]).

It did not take a mental health professional or other expert to reasonably persuade a fact finder in this case, by clear and convincing evidence, that mother's open, incessant charges of sexual abuse against father in front of his asserted victims, both less than three years old, was hideously inappropriate, emotionally damaging to the children, and had already manifested extraordinarily aggressive and assaultive behavior in the elder daughter toward certain adults (not including father) and other children. It took no insight beyond common sense to conclude that H.E. was old enough to understand these charges on some level and to have suffered ill effects, while the younger daughter was likely spared actual harm thus far only due to her lesser level of understanding. Mother herself seemingly lacked common sense, which suggested mental illness, serious lack of empathy and insight, vindictiveness, or perhaps even an honestly held rational belief. Whatever the case, however, exposing young children to constant tirades and accusations of such a charged nature could only cause harm and do them no good. Any reasonable trier of fact would so conclude on this record. As the court explained at the disposition: "[T]he difficulty here is that, based upon the conduct of mother, . . . we're in a position that we need to calm this situation so that we can actually get at the truth of the matter. Mother's behavior has exacerbated the problem." By this the court meant that mother's behavior and frequent sexual abuse charges in front of the children may have produced a "taint" of influence on them that made it impossible to ever reach the truth of her accusations.

Mother recites the need to find no other "reasonable means" of protecting a child (subd. (c)(1), (2)) but offers little as to what else the court could have done in these circumstances. Her suggestion of a return "under strict supervision" ignores her inability to control her behavior even during supervised visits.

The removal finding is supported.

### Reasonable Efforts Finding

The court found (§ 366, subd. (d)), by clear and convincing evidence, that "reasonable efforts were made to prevent or eliminate the need for removal of the children from the parents." Mother argues: "[T]here is no indication that the department made any efforts to prevent or eliminate the need for their continued removal. . . . [T]here is no indication that [mother] had been provided any services by the department or referred to a psychological evaluation. The services [in which mother] was participating were arranged for her by the representative from the Bear River Indian Tribe. . . . [T]his suggests that [mother] was and would have been receptive to services by the department, had they been offered."

■ We hold that the finding is supported, bearing in mind that our review is for substantial evidence (*In re Manuel G., supra*, 16 Cal.4th at p. 822) and that reasonable efforts, like reasonable services, need only be reasonable under the circumstances, not perfect (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547 [3 Cal.Rptr.2d 217]).

A key component of mother's argument—that services were offered by the tribe rather than the department—is meritless. The department was entitled to rely on services from private agencies and individuals (*In re Misako R., supra*, 2 Cal.App.4th at p. 547 [church members furnished part of a "wide range of services" that could be utilized]), including those from a nonintervening tribe (rule 5.534(i)(2)(F)). Mother in fact sought out and wanted the tribal assistance, and solicited social worker Creson to accompany her to supervised CWS visits so as to keep herself in a calm state of mind to deal with the stress she was under. With the department's encouragement and consent, Creson accompanied mother to seven supervised visits at the Family Connection Center in October and November 2007. The department knew of this. Owens wrote in her jurisdictional report: "On 10/09/2007 . . . Owens spoke to Johan[n]a Creson, a social worker employed by the Rohnerville Rancheria, Bear River Band. SW Creson stated that she has been contacted by the mother. At this point it is not verified whether the children are eligible for membership, but the Tribe will still offer to assist with services, including getting the mother to begin counseling and helping to set her up for a psychological evaluation." Thus the department must be credited for the work of Creson, who also had mother attending Love and Logic parenting classes and crisis counseling through a Breaking the Cycle program. Creson also referred mother to PCIT (parent-child interaction therapy) classes and helped her in making an appointment with Social Security and obtaining general relief.

Mother raises no criticisms about those services as such, and thus her complaint boils down to lack of a psychological evaluation prior to the

dispositional hearing. We see from evidence not discussed by the parties, however, that there *were* reasonable efforts in that regard. Creson had gained mother's trust, and department social worker Owens wrote in her jurisdictional report of October 2007, "There is hope that [mother] will be able to work with SW Creson, of the Rohnerville Rancheria, and complete a psychological evaluation and comply with any medication prescribed." We have already noted that Creson advised CWS as early as October 9 that she would be helping mother get an appointment for an evaluation. Creson testified that, when mother contacted her in October, she arranged for mother to have the evaluation performed by Dr. Tanenhaus and secured the first available date, December 5. This ultimately fell through, however, because Creson eventually found out that her program could not pay for the evaluation and that CWS would have to pay. Creson said she spoke with social workers Owens and Sanches from CWS, and Sanches assured her that CWS would pay. Carol Cole, mother's counselor, recommended to Creson that mother see Dr. Renouf. The funding problem evidently did not come to light until late November. Sanches wrote on November 28, in her dispositional report: "Ms. Creson . . . has reported that the tribe will not be able to pay for the psychological evaluation . . . . Ms. Creson states that she believes [mother] would benefit by completing a psychological evaluation and a medication evaluation." No mention is made of any new appointment, but the case plan attached to the report requires that mother complete those evaluations and sign releases of information so that the department can follow her progress.

We cannot discern from the record whether an appointment was made for mother to see Dr. Renouf, or anyone else, before the dispositional hearing of January 9, 2008, but the department had arranged through Creson to have a psychological evaluation done and thus was making reasonable efforts until Creson reported the funding problem. Then it assured her that the department would pay for the evaluation required it as part of the case plan. Beyond November 28, the record is silent. The disposition, due to occur the next day, was put over for five weeks on the parents' motion to continue, and an addendum report dated January 3, 2008, did not mention a new evaluation date. Nor was one mentioned during the dispositional hearing on January 9.

Accordingly, the most mother can show on this record is a *possible* lacuna of five weeks in three months of ongoing efforts to secure a psychological evaluation. Given the total efforts made to prevent removal of the children, a lacuna of that length does not render the overall finding of reasonable efforts unsupported.

## DISPOSITION

The judgment is affirmed.

Kline, P. J., and Haerle, J., concurred.

A petition for a rehearing was denied January 16, 2009, and appellant's petition for review by the Supreme Court was denied April 1, 2009, S170410.