Filed 8/15/23  In re L.J. CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In the Matter of L.J. et al., Persons Coming Under Juvenile Court Law. | B320979 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 21CCJP02835) |
| Plaintiff and Respondent, | |
| v. | |
| S.H., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Lisa A. Brackelmanns, Judge Pro Tempore. Affirmed.

Jesse Frederic Rodriguez, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Navid Nakhjavani, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

S.H. (mother) appeals from the juvenile court's orders sustaining a Welfare and Institutions Code section 342 supplemental petition as to her children, L.J. (born March 2015) and T.B. (born May 2018), and removing them from her custody.[1]  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**
**A.    The Original Dependency Action**

L.J. and T.B. first came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) in December 2020 due to concerns with mother's mental health and ongoing domestic violence between mother and T.B.'s father, Ta.B. (father).[2]  Several months later, mother took T.B. to the hospital to report that she had seen the child place his finger and a pencil inside of his anus.  In the presence of medical professionals, mother asked T.B. who had touched his anus; the child replied that

_____

[1]    Unspecified references are to the Welfare and Institutions Code.

[2]    Father and Lawrence J., L.J.'s father, are not parties to this appeal.

2

it was father's girlfriend.[3]  Mother stated that the children were role-playing sexual acts they had witnessed between father and his girlfriend.

During her initial interview in May 2021, mother reported that while she and father were separated, father occasionally visited the children at her home.  During many of his visits with the children, father would engage in verbal and physical altercations with mother.  L.J. had to intervene in one altercation to stop father from hitting mother with a wooden hanger.  In another incident, father sprayed mother with mace.  Mother denied having a mental health history, declined a voluntary up front assessment, and refused to sign consent forms for her mental health service provider.

L.J. denied being sexually abused or inappropriately touched in any way.  T.B. was not fully verbal and could not provide a statement.

In his initial interview, father denied sexual and physical abuse and denied having a history of domestic violence with mother.  Father contended that mother's false allegations were "a pattern of concern" placing the children at risk of harm.  Father's girlfriend denied touching the children and noted that mother started exhibiting strange behavior in July 2020 after father moved out of her home.

Paternal grandmother, Donna S., reported similar concerns for mother's unresolved mental health issues, suspecting mother might be using methamphetamine and/or

_____

[3]     Medical reports later obtained by DCFS indicated a "[n]ormal external exam, [and] no lesions/findings noted."

having an ongoing mental health crisis. Over the past few months, mother told Donna S. that another person (also named Donna) was after the children, and she sent Donna S. inappropriate pictures and text messages suggesting father was gay. Following her interview, Donna S. called DCFS to report that San Bernardino County Child Protective Services (CPS) was at her home investigating concerns of child abuse of her own children. Donna S. believed mother had contacted CPS in retaliation for Donna S.'s interview with DCFS.

According to a police report, mother, fearing her neighbors had hacked into her computer to see the children's genitals, called the police in January 2021. Officers who responded to mother's home called in a referral to DCFS questioning whether mother had undiagnosed schizophrenia.[4]

On June 17, 2021, DCFS filed a non-detain petition on behalf of the children under section 300, based on the parents' history of domestic violence and father's abuse of alcohol. The court found a prima facie case under section 300, and released the children to the home of parents.

The court held a combined jurisdiction/disposition hearing on August 19, 2021. In a report filed the same day, DCFS reported that the children remained in the home of mother. During a follow-up interview, father reported that mother "coache[d] the children to say [false] things about

---

[4] Finding no additional evidence of ongoing incidents in mother's home, DCFS disposed of the referral as unfounded.

him." Father stated that when mother has "temper tantrums," she "blacks out" and "has hit him and stabbed him before." Around 9:00 p.m. one evening, the children called father. When asked if mother was home, the children responded that maternal uncle Herbert H. was watching them. Previously, father had prohibited Herbert H. from watching the children because Herbert H. had mental health issues and was living in a halfway house. Father drove to mother's home around 9:45 p.m. and cared for the children throughout the night. Mother returned home around 7:00 a.m. appearing "'[t]ired. Like a drug tired.'" As of the date of the jurisdiction/disposition hearing, both children were receiving therapy services.

At the hearing, the court sustained allegations of domestic violence and father's alcohol abuse under section 300, subdivision (b)(1),[5] and issued a family maintenance case plan for both parents. Mother's case plan included a family preservation program, mental health counseling, and individual counseling to address parenting, co-parenting, domestic violence, and mental health. The court also ordered the parties to confer on a written custody schedule.

## B. Family Maintenance Period

As reported in a March 2022 status review report, father was in compliance with his case plan and was showing "an awareness in protective factors." Mother was

_____

[5] The court dismissed domestic violence allegations under section 300, subdivision (a).

5

noncompliant with her case plan. She refused family preservation and mental health services, reasoning that she had never been ordered to participate in mental health counseling. She also reported that her own treating therapist said she did not have any problems. Mother provided no documentation for her therapist, refused to call her medical provider to retrieve information from her therapy sessions, and refused to sign forms releasing her medical information to DCFS.

Several times between December 2021 and February 2022, mother vacillated between permanently surrendering T.B. to father's care and withholding the child from custody exchanges with father. On January 17, 2022, mother stated, "[Father] can keep [T.B.] I want to relinquish my rights. . . . I'll see him when he is 18." Two weeks later, mother refused to release T.B. to father, stating, "[Father and his girlfriend are] abusing my child and DCFS is not doing anything about it." Two days later, mother reported that she had been hit by a car and said that father "'can keep [T.B.]'" During another incident, mother "refused to receive [T.B.], when it [was] her turn to have the child return to her care, despite her concerns of physical and sexual abuse."

DCFS received an additional referral in February 2022 for general neglect. The reporting party stated that mother could be "diagnosed with Paranoid Schizophrenia and there is suspicion that the mother's current state of mental health affects her ability to parent." The day of the referral, mother informed DCFS that T.B. was returned to her care with

scratch marks. Mother accused father's girlfriend of physically abusing the child. The reporting party spoke with father, who replied that T.B. had no scratch marks on him before father exchanged the child with mother, as proven by pictures of the child taken before the exchange. Father also reported that his girlfriend did not live with him and was not allowed to touch T.B. pursuant to the ongoing dependency case. The reporting party questioned mother's accusations and whether she had physically abused T.B. and "blam[ed] it on the father's girlfriend."

Another referral was generated following a custody exchange on March 4, 2022, at mother's home. When father contacted mother to exchange T.B., mother refused to release the child to father. After a social worker and several police officers arrived at her home, mother screamed and cursed at them "while both children were looking out of the window crying and [appeared] sorely petrified, . . . ." Officers secured T.B. from the home and took the child down the street to father. The child jumped in father's arms and smiled.

During an unannounced visit at her home several days later, mother was asked about the incident. Mother yelled at the social worker, "Your supervisor came here and you let [T.B.] go to his father . . . even though he (the father) is licking my child's anus."[6] Mother continued to yell at the

---

[6]    T.B. told a social worker that father did not sexually abuse him. Medical records showed that mother had taken T.B. to be examined

*(Fn. is continued on the next page.)*

social worker and recorded the social worker as she walked away. L.J. was present during the incident.

Father was "shock[ed]" at mother's new allegations of sexual abuse. He stated that it was evident mother suffered from severe mental health problems. He also believed mother was trying to instill in T.B.'s head that father was abusing him. Father produced two videos from mother asking the children leading questions about his alcohol use.[7] Father reported that mother "places the child, [T.B.], in the middle of her issues, which has an emotional effect on the child." In light of the last incident and the current sexual abuse accusation, father believed T.B. needed therapy. Father agreed to follow through with any recommended services.

On March 18, 2022, mother accused father and DCFS of kidnapping her son. In a text message to DCFS, mother stated, "I'm asking for an Amber Alert. Y'all [father and a social worker] kidnapped my son on Sheriff Department video cam." At the time, DCFS was in the process of seeking a removal order.

---

three separate times for sexual and physical abuse between April 2021 and February 2022. No findings of abuse or trauma were noted.

[7]     In both videos, mother asked the children questions "quickly and aggressively about the child(ren) witnessing the father drinking alcohol. They both answer[ed] that they did not see the father drinking, but the mother continue[d] to ask question[s] to get the answer she wanted, . . . . [T.B.] never mentioned the father drinking . . . but [L.J.] changed her answers to conform to mother's leading questions."

## C.    The Subsequent Petition

The court issued an order removing the children from mother's care on April 1, 2022.  In a section 342 petition filed a week later, DCFS alleged that mother's history of mental and emotional problems placed the children at risk of serious harm.  The petition alleged a failure to protect, willful or negligent failure to supervise, and an inability to provide regular care due to mental illness or substance abuse.

In a detention report filed April 21, 2022, DCFS reported that mother refused to release L.J. to DCFS and law enforcement despite a removal warrant.[8]  L.J. exhibited disruptive behaviors in school and was disenrolled after being "chronically absent."  Mother refused to provide an explanation to the school for L.J.'s absences.  While in daycare, T.B. hit other children before telling mother that he had been assaulted by another child.  In one incident, T.B. told mother that a teacher had hit him.  DCFS recommended referring both children for emotional and mental health needs.

The court detained children from mother, ordered monitored visitation, and ordered mother to sign all waivers and releases for her medical records.  The court set the

_____

[8]    When law enforcement presented mother with the removal order, she said L.J. was "not here."  A social worker informed mother that L.J. had been seen entering the home.  In response, mother slid a notarized letter under the front door that read, "I, [mother], give [maternal great aunt] Rhonda M[.] custody of [L.J.] . . . for support to get back on my feet."

9

matter for a jurisdiction/disposition hearing on May 19, 2022.

## D. Jurisdiction/Disposition Hearing on the Subsequent Petition

In a jurisdiction/disposition report filed on May 4, 2022, DCFS reported that T.B. was living with father while L.J. was in foster care. Mother continued to deny having mental health issues despite a letter from her medical provider recommending additional psychotherapy. Mother continued to accuse father of sexual abuse but did "not mind if the minors ha[d] visits" with him. DCFS reported "extreme concern" for mother's erratic and aggressive behaviors.

Following a psychological examination, an evaluator determined that T.B. would benefit from mental health services. "However, mother declined services at the time and therefore the minor was not linked." L.J. had not been assessed for mental health services.

DCFS further reported that mother had participated in three individual counseling sessions with her medical provider, but because mother reported that she was not a danger to herself or others in her sessions, she did not meet the criteria for mental health services through her provider. In a follow-up conversation, mother's therapist stated that "her hands [were] tied," as [she was] not a court mandated therapy provider." DCFS continued to recommend a mental health assessment to determine mother's ability to parent.

DCFS also reported that L.J. started fighting other children in her foster placement. In one incident, L.J. slapped another child in the face for no apparent reason. L.J. was uncontrollable at times and threatened to assault her caregivers. DCFS requested a mental health services order for L.J.

At the joint jurisdiction/disposition hearing on May 19, 2022, mother argued there was no medical opinion on her mental health or her ability to care for the children. Following argument of counsel, the court found by a preponderance of the evidence, "[Mother] displayed bizarre behavior, erratic and aggressive behavior, and I do think that her mental health issues are still ongoing, and it would be unsafe to return the children to her care at this time." Taking into account the children's tender age, the court found by clear and convincing evidence that it was necessary to remove them from mother's care. The court considered a letter by mother's therapist reporting on her completion of three therapy sessions but noted that the therapist did not have "all the documents and reports" to fully evaluate mother's mental health. The court sustained the section 342 petition, removed the children from mother's custody, ordered family reunification services, monitored visitation, and a mental health evaluation (Evid. Code, § 730). Mother timely appealed.

## DISCUSSION

### A. Governing Law

"In any case in which a minor has been found to be a person described by Section 300 and [DCFS] alleges new facts or circumstances, other than those under which the original petition was sustained, sufficient to state that the minor is a person described under Section 300, [DCFS] shall file a subsequent petition." (§ 342, subd. (a).) "Unless otherwise provided by law, all procedures and hearings required for an original petition are applicable to a subsequent petition under this section." (§ 342, subd. (b).) Those procedures include detention and jurisdiction and disposition hearings pursuant to section 300. (*In re B.P.* (2020) 49 Cal.App.5th 886, 890.)

At the trial court level, the burden of proof for jurisdictional findings is preponderance of the evidence; for removal it is clear and convincing evidence. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248.) We review both orders for substantial evidence. (*In re D.B.* (2018) 26 Cal.App.5th 320, 328 (*D.B.*); *In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*); see *In re V.L.* (2020) 54 Cal.App.5th 147, 155 [for substantial evidence review of a disposition order, "the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable factfinder could have found it highly probable that the fact was true"].) In construing the record, "'"we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; . . . issues of

12

fact and credibility are the province of the trial court.'"'"
(*I.J.*, *supra*, at p. 773.)

**B.  Jurisdictional Findings**

Mother contends insufficient evidence supports the trial court's findings that her mental illness posed a serious risk of harm to the children.  We disagree.

Juvenile dependency proceedings are intended to protect children who are currently being abused or neglected, "and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm."  (§ 300.2, subd. (a).)  As relevant here, section 300, subdivision (b)(1) authorizes a juvenile court to exercise jurisdiction over a child if it finds that the child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the inability of the parent to provide regular care for the child due to mental illness.  (§ 300, subds. (b)(1)(A), (b)(1)(D).)

A jurisdictional finding under section 300, subdivision (b)(1) requires proof of three elements:  "(1) the parent's . . . neglectful conduct or failure or inability to protect the child; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness."  (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601 (*Cole L.*); see *In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561 ["section 300, subdivision (b)(1) does not require that a parent commit

13

neglect or deserve blame . . . , only that an actual inability to provide the necessary supervision or protection exists"].)  For jurisdiction to be appropriate, the substantial risk of serious physical harm or illness must exist at the time of the jurisdictional hearing.  (*In re D.L.* (2018) 22 Cal.App.5th 1142, 1146.)

The juvenile court in this case cited mother's erratic and aggressive behavior as evidence of ongoing mental health issues that placed the children at risk of harm at the time of the jurisdiction hearing.  Substantial evidence supports these findings.

Several individuals voiced concern about mother's mental health, including father, Donna S., social workers, and police officers.  Mother made ongoing and unfounded allegations of sexual abuse against father both to DCFS and her own medical providers, yelled obscenities at social workers and law enforcement officers, coached the children to lie about allegations of sexual abuse, and restricted T.B.'s access to mental health services.  Against court orders, mother did not adhere to her family maintenance case.  She refused to participate in mental health services and stonewalled any attempts by DCFS to obtain her medical records.  (Accord, *In re G.C.* (2020) 48 Cal.App.5th 257, 265 [jurisdictional findings upheld as based on unresolved mental health issues and failure to complete family maintenance case].)

Mother also expressed divergent intentions with respect to child custody.  Several times during the family

14

maintenance period, mother vacillated between withholding T.B. from father, whom she accused of sexual abuse, and completely relinquishing T.B. to father's care. During a custody exchange in March 2022, mother screamed obscenities at law enforcement and a social worker while the children watched the incident "petrified." On another occasion, mother left the children alone with a family relative known to have mental instability. From this behavior, we discern considerable uncertainty as to mother's ability to provide regular and adequate care for both children.

And though it is true that there was no finding that the children suffered physical harm from mother's conduct, "the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child." (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1216; accord, *Cole L., supra,* 70 Cal.App.5th at pp. 601–602.) "It is not necessary for DCFS or the juvenile court to precisely predict *what* harm will come to [the children] because [m]other has failed to consistently treat her illness. Rather, it is sufficient that [m]other's illness and choices create a substantial risk of *some* serious physical harm or illness." (*In re Travis C.* (2017) 13 Cal.App.5th 1219, 1226–1227.) Substantial evidence supports the court taking jurisdiction over the children.

## C.    Disposition Order

Mother makes similar arguments challenging the court's findings that removal of the children was necessary. Again, we disagree.

Before a child may be ordered physically removed from parental custody, the juvenile court must find by clear and convincing evidence that:  (1) a substantial danger exists to "the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home [to the parent]," and (2) there are no reasonable means to protect the minor's health without removing the minor from the parent's physical custody.  (§ 361, subd. (c)(1).)  As mother herself concedes, the former inquiry is made as to the child's physical *and* emotional health and well-being. (See *In re H.E.* (2008) 169 Cal.App.4th 710, 720 (*H.E.*) ["case law has long construed section 361 as allowing removal where 'return of the child would create a substantial risk of detriment to the child's physical *or* emotional well-being'"].) In determining whether a child may be safely maintained in a parent's physical custody, the juvenile court may consider the parent's past conduct, his or her response to the conditions that gave rise to juvenile court intervention, current circumstances, and any reasonable protective measures and services that can be implemented to prevent the child's removal from parental custody.  (*D.B., supra,* 26 Cal.App.5th at p. 332.)

Considering the children's tender age, the trial court found clear and convincing evidence that mother's behavior

16

posed a substantial risk to the children's health or emotional well-being if left in mother's care. Substantial evidence supports this finding.

The record reveals multiple instances in which mother's behavior harmed the children's safety and well-being. Between April 2021 and February 2022, mother took T.B. to the hospital to make unsubstantiated allegations of sexual abuse against father and his girlfriend, subjecting T.B. to repeated examination. Open, repeated, and unfounded charges of sexual abuse against the other parent are inappropriate and emotionally damaging to children. (*H.E.*, *supra*, 169 Cal.App.4th at p. 724 ["[E]xposing young children to constant tirades and accusations of such a charged nature could only cause harm and do them no good"].) Further, mother coached the children to lie about father's use of alcohol and acted aggressively towards police officers and a social worker in their presence.

Mother's behavior had a manifest impact on the children. L.J. exhibited aggressive behavior and was disenrolled from school for being "chronically absent," much to her detriment. T.B. also displayed aggressive behavior, and as of the date of disposition, a psychological assessment recommended further mental health services for T.B. However, mother declined such services, despite their potential benefit to T.B.'s emotional health. Thus,

17

substantial evidence supports the court's removal finding in this case. [9]

## DISPOSITION

The jurisdictional findings and disposition orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MORI, J.

We concur:

CURREY, P. J.

COLLINS, J.

---

[9] Mother does not challenge the court's finding that there were no reasonable means by which the children's health could be protected without removing them from mother's custody. (See § 361, subd. (c)(1).)