Filed 1/28/21  In re D.V. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re D.V., | B307336 |
| a Person Coming Under the Juvenile Court Law. | (Los Angeles County Super. Ct. No. 20CCJP01420) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| LEONCIO V., et al., | |
| Defendants and Appellants. | |

APPEALS from an order of the Superior Court of Los Angeles County, Michael E. Whitaker, Judge.  Affirmed.

Gina Zaragoza, under appointment by the Court of Appeal, for Defendant and Appellant Leoncio V.

Annie Greenleaf, under appointment by the Court of Appeal, for Defendant and Appellant Julianna R.

Rodrigo A. Castro-Silva, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Veronica Randazzo, Deputy County Counsel, for Plaintiff and Respondent.

———————————

Father Leoncio V. and mother Juliana R. appeal from the juvenile court's July 8, 2020, dispositional order.[1]  Father and Mother maintain that the juvenile court erred in removing their son, D.V., from them because the Department of Child and Family Services (DCFS) failed to make reasonable efforts to prevent removal.  They contend that insufficient evidence supported the juvenile court's finding pursuant to Welfare and Institutions Code section 361, subdivision (c)(1),[2] that no reasonable means existed to protect D.V. without removing him from parental custody.

At the time of his birth, D.V. was diagnosed with severe medical conditions that required a high degree of care.  Due to D.V.'s complex medical needs and the demonstrated inability of the parents to provide the required level of care, we conclude the juvenile court did not err in removing D.V. from his parents, and affirm the juvenile court's dispositional order.

———————————

[1] Neither parent challenges the juvenile court's jurisdictional findings.

[2] All subsequent statutory references are to the Welfare and Institutions Code unless otherwise specified.

2

# FACTUAL AND PROCEDURAL BACKGROUND

## A.    Mother's Prior History with DCFS

Mother has three prior, substantiated child welfare referrals.  First, on January 30, 2014, the juvenile court sustained a petition relating to Mother's three older children, J.D, G.D., and O.D., due to domestic violence between Mother and her former husband and the children's father, M.D., and due to M.D.'s alcohol use.  The juvenile court terminated jurisdiction in July 2014, with Mother and M.D. sharing custody of the children.

In May 2017, DCFS received a referral alleging that Mother's fourth child, F.D., a toddler, was a victim of general neglect and that his siblings were at risk.  According to the referral, F.D. was found wandering alone on a major street.  He was wearing a shirt but no underwear.  Mother had been asleep in the apartment.  DCFS visited the home, observed F.D. could open the front door, identified areas in the home where F.D. could get out, and advised Mother to take corrective action.  DCFS determined F.D. was safe and did not take further action.

In June 2017, DCFS received a referral that alleged the children were victims of general neglect following another instance of F.D. wandering away from the family's second story apartment to a supermarket parking lot.  Mother blamed F.D. for the incident.  In September 2017, the juvenile court found the children to be described by section 300, subdivisions (b) and (j), due to Mother's failure to provide adequate parental supervision.  The court ordered Mother to participate in a parent education program, individual counseling, a mental health evaluation, and

Regional Center services.[3]  Although Mother partially complied with the classes and counseling, she did not participate in Regional Center services.  In March 2018, the juvenile court awarded sole legal and physical custody of the four children to M.D. and permitted Mother to have monitored visits.  The juvenile court noted that Mother's visits were monitored because she had not made substantial progress in the Regional Center services.

## B.    D.V. Is Born and Requires Medical Care

D.V. was born in July 2019, at 29 weeks gestation.  D.V. has multiple medical problems, including global developmental delays; a seizure disorder; chronic lung disease and sleep apnea; and a feeding intolerance.  He requires oxygen treatment and feeding through a gastrostomy tube (G-tube).  Due to his medical needs, D.V. remained in the hospital.  In September 2019, he was transferred to the neonatal intensive care unit (NICU) at Children's Hospital Los Angeles (CHLA).  D.V. remained at CHLA through March 10, 2020.

Between September 2019 and January 2020, Mother and Father met with hospital staff on four occasions to receive information to prepare them for D.V.'s discharge.  On September 13, 2019, Father and Mother had their first meeting at the NICU to discuss D.V.'s medical needs and the

---

[3] Regional Centers are nonprofit corporations that contract with the California Department of Developmental Services to provide services and resources to individuals with developmental disabilities.  (See L.A. County Dept. of Mental Health, Regional Centers for the Developmentally Disabled https://dmh.lacounty.gov/our-services/developmental-disabilities/regional-centers/ [as of Jan. 28, 2021].)

4

requirements for D.V. to be discharged to their care. On November 1, 2019, a second meeting covered D.V.'s medical treatment to date, and the next steps and expectations. During a third meeting on January 9, 2020, the parents were provided information about the G-tube; however, the parents expressed hope that D.V. would not need a G-tube upon his discharge. The fourth meeting on January 27, 2020, focused on understanding the G-tube and its basic care. During this fourth meeting, the parents requested that they be provided further G-tube training, which the hospital provided to them on February 16, 2020.

## C.    DCFS's Investigation Relating to D.V.

### 1.    *Evidence of the Parents' Initial Resistance to Recommended Medical Care*

On January 20, 2020, DCFS received a referral alleging that D.V. was a victim of general neglect. According to the referral, earlier that day, Mother and Father were observed to be intoxicated at the hospital in D.V.'s presence and were asked to leave. The referring party also stated the parents lacked an understanding of how to properly care for D.V., and they had attempted to feed D.V. orally that day, causing him to cough.

On January 21, 2020, a DCFS social worker interviewed the hospital social worker (HSW), hospital nurse, an occupational therapist feeding specialist, Mother, and Father. The HSW expressed concern about the parents' drinking and lack of understanding about D.V.'s medical needs, including his need for a G-tube. Although the parents seem to comprehend in the moment what was told to them, soon after, the parents asked the same questions. The parents made statements such as, "Don't feed the baby overnight and you'll see he will be able to feed on his own." Further, the parents stated they believed the doctor

was lying about D.V.'s need to be fed through a tube and overall medical diagnosis.

The hospital nurse told the DCFS social worker that D.V. was currently fed via a nasogastric tube, and was only fed by an occupational therapist feeding specialist. The nurse stated that the parents were very concerned and attentive, but lacked an understanding of how to care for D.V. The nurse also stated that on January 20, 2020, the parents were arguing, and Father confirmed that he had consumed alcohol. Mother did not appear intoxicated.

The occupational therapist feeding specialist reported that D.V. struggled to feed on his own. When bottle fed, he coughed and appeared to be in respiratory distress. She stated that D.V. was at high risk of aspiration pneumonia, his back posture was a "C shape," and his eyesight was "unknown." She also reported concern that the parents did not comprehend the severity of D.V.'s needs. She noted they continually asked to bottle feed him.

A DCFS social worker interviewed Father. Father was frustrated that the medical staff would not permit him to bottle feed D.V. Father requested that they try bottle feeding for seven days, and if D.V. could not bottle feed, Father would approve the G-tube procedure. The hospital staff granted the parents four days to bottle feed D.V., but after he coughed during one of the feedings, the feeding specialist suspended the parents' ability to bottle feed him. Father told the social worker that if D.V. was not fed overnight, he would be able to latch on and feed on his own. Father denied feeding D.V. by bottle against doctor's recommendations.

6

Father also reported that doctors had advised him that D.V. was not able to move, his brain was "not well," and that they were unsure of his eyesight. Father did not believe these things to be true because he observed D.V. moving and smiling, and believed D.V. could see. Father acknowledged that D.V. took medicine to keep his seizures under control.

Father was remorseful about drinking three beers at a restaurant and then visiting the hospital. He loves D.V. and denied handling him in an unsafe manner. As to whether he was arguing at the hospital with Mother, Father explained he and Mother speak loudly and that he uses curse words "a lot."

DCFS interviewed Mother at home. She reported she had been in a relationship with Father for six years. She confirmed she had a prior history with DCFS and had not had contact with her other four children for more than a year. Mother expressed frustration with the hospital staff for not feeding D.V. enough food and for the bottle-feeding restrictions. She stated D.V. was healthy and could be bottle fed without any medical risks. She denied bottle feeding him against doctor's recommendations. She also stated that D.V.'s oxygen levels were at 98 and he is receiving more oxygen than he needs. She acknowledged D.V. has seizures that are under control with medication. She stated she visits D.V. nearly every evening, and bathes and cares for him.

Concerning Father's intoxication at the hospital, she explained they had walked from the hospital to a local restaurant, and Father consumed three beers with his food. She denied the couple argued, stating they may have spoken in a loud tone of voice.

A DCFS public health nurse (PHN) reviewed D.V.'s medical records and spoke with the CHLA nurse. As of January 22, 2020, the parents refused the G-tube placement procedure for D.V.'s feeding.

On January 28, 2020, the HSW contacted DCFS. She reported she was concerned about both parents' careless behavior. She stated that on January 26, 2020, D.V.'s nasogastric tube had been unlashed during a feeding, and when the nurse tried to fix it, Father laughed and stood in front of the nurse, obstructing the nurse. Father denied purposely obstructing the nurse's ability to access D.V. The HSW also was concerned because Mother advised that D.V.'s nasal cannula for oxygen therapy had dislodged from his nasal passage for two and a half hours. However, Mother did not report this or put the cannula back in.

2. *Additional Efforts to Train the Parents Concerning D.V.'s Medical Needs*

On January 30, 2020, Mother advised DCFS she was more comfortable in learning about the G-tube. As to the oxygen tube becoming detached, Mother stated that she now understood from the doctor that D.V. needed the oxygen treatment.

On January 30, 2020, the PHN confirmed the parents agreed to the G-tube placement for D.V. D.V. underwent the G-tube procedure on February 11, 2020.

On February 12, 2020, a nurse discussed the G-tube and D.V.'s medications with Mother and Father for 30 minutes. The nurse showed the parents how to disconnect the feeding tube and had them practice administering medication. The following day, a nurse assisted Mother and Father in providing medications to D.V.

8

On February 16, 2020, the parents attended a G-tube training session.[4]  Among other things, the training included what to do if the tube fell out, how to clean the tube, and how to administer food and medication through the tube.

The hospital also required the parents to participate in an in-hospital, hands-on 24-hour care period during which the parents would have one-on-one training with a nurse monitoring D.V.'s medical needs, feeding, and G-tube cleaning.  During this session, the parents would be prompted "to do everything without assistance but if done incorrectly they will be retrained until it's done correctly."  The parents would then each need to complete an additional 12-hour hands-on training during which each parent would independently care for D.V., with a nurse supervising during certain tasks such as feedings and medication administration.

On February 18, 2020, the social worker was advised the parents had successfully completed the 24-hour training, although they still needed to complete nebulizer training.[5]  The HSW stated that Mother did well on flushing the tubes but had to be reminded to wash her hands before handling the tubes.  The HSW reported that Mother understood D.V.'s medical needs and had the "best intentions to care for the child."  However, the

---

[4] Although this training was scheduled for February 14, 2020, the medical records suggest it occurred on February 16, 2020.

[5] Whether the parents successfully completed the training was called into question by a subsequent review of the training report by a medical doctor, which noted the parents "were unable to perform the entire training."

bedside nurse observed that the parents appeared to need more practice.

During the 24-hour training, Father insisted D.V. was "normal," and did not need oxygen treatment or a nebulizer. When a nurse told him that D.V. had chronic lung disease, Father responded, "no, he does not." The next day, Father appeared agitated and challenged the nurse when she advised him that he needed to participate in nebulizer training.

On February 20, 2020, the HSW reported to DCFS that the medical team had significant concerns that D.V.'s parents did not understand his medical needs. The parents did not believe D.V. had a lung disease, required oxygen treatment, or required all his medications. Thus, the HSW feared if D.V. was released to his parents, that they would not provide the necessary medical care. Further, although Father had been trained to give D.V. 0.5 liters of oxygen, staff observed him "turn[ing] it up to" eight liters. The HSW also reported she had made provisions for an eight-hour, in-home nurse for five to seven days a week. Still, the HSW expressed concern that Father did not seem to be interested in learning about D.V.'s care because, as he explained, he would often be away at work. She stressed that it was important that Father learn about D.V.'s tube feeding, oxygen requirements, and medication administration because he was the backup caregiver when Mother was sick or could not perform these tasks. The DCFS social worker therefore spoke with Father and advised him of the importance of being able to perform these tasks. Father agreed to participate in future trainings.

On February 20, 2020, a CHLA doctor wrote a letter to the PHN in which the doctor opined it would be unsafe to release D.V. to his parents. The doctor explained that D.V. was an

"incredibly medically complex six-month old." The doctor warned, among other things, that, "[i]f he were to miss [his] breathing treatments, he would have worsening of his lung disease, which could potentially cause permanent neurologic deficits, brain damage, and possible death."

According to the doctor, the medical team believed neither parent understood the severity of D.V.'s medical diagnoses, and that each parent had limited medical literacy or medical competency. Based on the medical team's experiences, the doctor believed it was likely the parents would stop giving D.V. some medications, take him off his oxygen, or forget how to give him G-tube feedings, which would put D.V.'s life in danger.

The doctor also noted concern that Mother did not know how to use public transportation, which could impede her ability to get D.V. to medical appointments.

On February 22, 2020, Father asked to speak with a doctor so that he could tell the doctor that D.V. was "on so many medications, he doesn't need all of these medications. I have never seen an attack [seizures], his mom has never seen an attack and you guys haven't seen an attack." After the nurse explained that the medications prevent the seizures, Father told the nurse that he wanted the doctors to stop the medication so that he could observe D.V. have a seizure. The nurse advised Father that would not be appropriate or benefit D.V. in any way. Father insisted D.V. was "not sick," and demanded the doctors show him proof that D.V. needed the medications. Mother interjected, explaining that the nurse knew more about D.V.'s medical needs than Father.

A nurse also reported that during a visit, Mother held D.V. in a manner that caused pulling on his G-tube. Mother had

difficulty removing D.V.'s gown, covering his face with the gown and not using proper head support. Additionally, after Mother administered medication, D.V. began to gag and neither parent reacted, even though Mother had received training on January 25, 2020, to reposition D.V. to avoid choking. Staff also noticed that on one occasion when Father held D.V., Father began to rapidly rock him. The nurse told Father that this activity could make D.V. throw up or become injured. Father responded that D.V. liked it and that it was rough play. Father stopped after Mother intervened and told him to stop.

       3.     *The Parents' Participation in the 12-hour Independent Care Training*

On February 23, 2020, Mother attended a 12-hour hands-on training session during which she would independently perform the tasks necessary for D.V.'s care. The supervising nurse corrected Mother in several tasks. For example, with respect to flushing D.V.'s G-tube, Mother failed to realize she had drawn 3 units of air into the flushing syringe instead of water, which would cause D.V. to get air in his stomach. Further, Mother did not close and disconnect the necessary tubes or press the correct buttons on the G-tube pump. Mother confirmed to the nurse that D.V.'s next feeding would be in two hours. However, Mother did not contact the nurse at the time of feeding to bring in the food, and the nurse found Mother asleep in D.V.'s room. Approximately six hours later, Mother needed prompting to remember D.V.'s medications were due. Following administration of medications, Mother reconnected the feeding tube, pressed "run," but forgot to re-open the feeding tube so that the medication could travel through to D.V. Then, a couple hours later, Mother attached a feeding bag and attempted to feed D.V.

She needed reminding that "the bag had run dry and the tubing had air in it so she needed to prime it again." When the pump again beeped, the nurse pointed out that the tubing had a kink. After Mother left the hospital, a respiratory therapist informed the nurse that D.V. was connected to an empty tank and not to the wall oxygen. Mother did not pass the 12-hour independent care period. Staff noted that if the mistakes had not been noticed by bedside nursing staff, D.V. would have missed medications and feedings, and would have been without his supplemental oxygen for extended periods of time.

Concerns were also noted regarding Father's 12-hour training that occurred on February 24, 2020. Father needed to be cued as to the steps for stopping feeds. He had difficulty administering medications, he did not understand the measurements, and he did not know the purpose of each medication. He needed to be reminded not to leave an adaptor near D.V. because he might put it in his mouth. Father did not pass the 12-hour independent care training because he was unable to administer all the medications independently, was late on some medications, and required instruction to clamp the G-tube after medication administration.

4.      *The Hospital Discharge Plan*

On February 24, 2020, the hospital reported that D.V. was stable and ready to be discharged. On or about February 26, 2020, the PHN reviewed D.V.'s medical files and concluded that D.V. would require "[c]ontinuous G-tube feeding [and] [c]ontinuous oxygen." Accordingly, the PHN recommended that D.V.'s caregiver be certified to address these medical needs.

On March 5, 2020, the social worker informed the parents that the hospital was unwilling to release D.V. to their care.

13

Father expressed that he did not understand the hospital's concern because he believed he had passed the trainings. Further, Father did not think an in-home nurse was necessary because he and Mother knew how to take care of D.V. Mother also stated she was told that she passed the training.

That same day, DCFS filed an application to remove D.V. from the parents. The juvenile court authorized removal.

## D.    DCFS Files a Section 300 Petition Concerning D.V.

On March 10, 2020, DCFS filed a petition alleging that D.V. came within the juvenile court's jurisdiction pursuant to section 300, subdivision (b)(1). In count b-1, DCFS detailed D.V.'s multiple medical problems, which included epilepsy and chronic lung disease of prematurity. The allegations referenced D.V.'s need to receive oxygen treatment around the clock, his feeding intolerance, necrotizing enter[o]colitis, and the insertion of a gastrostomy feeding tube. The petition alleged that Mother and Father have a limited ability to provide "appropriate medical care and supervision." They did not believe "the child has chronic lung disease and breathing problems and disagree with the doctor's treatments." They "failed to show medical competency due to [a] lack of comprehension of the child's severe medical needs." Mother insisted D.V. was healthy and believed he could be bottle fed with no medical risks. She resisted the G-tube procedure as unnecessary. The parents failed to pass the 12-hour independent care training. The petition summarized, "Said inability to provide appropriate medical care and supervision of the child by the parents endangers the child's physical health and safety and places the child at risk of serious physical harm and damage."

14

In count b-2, DCFS alleged that Father abused alcohol, rendering him incapable of providing regular care to D.V. The juvenile court ultimately dismissed count b-2.

On March 10, 2020, CHLA discharged D.V., and DCFS placed him with a foster parent.

### E. The Juvenile Court Orders D.V. Detained from Parents

At the March 11, 2020, detention hearing, the juvenile court ordered D.V. detained from the parents. The court ordered DCFS to assist the parents "regarding any/all medical training required for the care of minor." The court explained, "[t]hat will include the 12-hour course that's referenced in the detention report and all other courses that the department may determine may be necessary." Additionally, the juvenile court ordered that DCFS provide services and referrals for the parents, including counseling, parenting programs, and psychological/psychiatric evaluations and treatment. Mother and Father were to have monitored visitation with D.V. twice per week.

The juvenile court scheduled the jurisdictional and dispositional hearings for May 11, 2020. However, due to delays associated with the Covid-19 pandemic, these hearings were continued to July 8, 2020.

### F. Events Occurring Between the Detention Hearing and the Jurisdictional and Dispositional Hearing

On March 19, 2020, due to the state of emergency created by the Covid-19 pandemic, Governor Gavin Newsom issued Executive Order N-33-20, by which he ordered Californians to "stay home . . . except as needed to maintain continuity of operations of the federal critical infrastructure." Under the order, "[t]he healthcare delivery system shall prioritize services

15

to serving those who are the sickest . . . ." (Governor's Exec. Order No. N-33-20 (Mar. 19, 2020).)[6]

In its May 11, 2020, jurisdictional and dispositional report, DCFS recognized that "[i]n March 2020, the President of the United States, the Governor of the State of California and the Mayor of Los Angeles declared a State of Emergency due to the current Covid-19 pandemic, and issued [s]ocial [d]istancing mandates. Due to the directives issued by the Federal, State and Local Governments for [m]aximum [s]ocial [d]istancing, [DCFS] has implemented temporary changes for specific policies in order to abide by the said guidelines and ensure the safety of staff and the community while completing the essential social work functions." Maximum social distancing practices include "telephonic/virtual contact and interviews between staff and clients." Thus, due to the pandemic and D.V.'s compromised health, Mother and Father's visits with D.V. were limited to two video conferences per week.

On April 16, 2020, a social worker interviewed Mother and Father. Mother reported she did not understand why DCFS said she was not capable of caring for D.V. She said she took the necessary training and was told she had passed. She claimed the hospital lied to her. Mother questioned the hospital staff's efforts to bottle feed D.V., and wanted "to see with [her] own eyes that he wasn't able to." She understood D.V. has medical needs, but stated that she is his mother and she believes she is able to care

---

[6] See https://www.gov.ca.gov/wp-content/uploads/2020/03/3.19.20-attested-EO-N-33-20-COVID-19-HEALTH-ORDER.pdf [as of Jan. 28, 2021].

for him.  Mother reported she was on the waiting list for Regional Center services.

During Father's interview he stated, "The hospital lied to us a lot.  He doesn't need oxygen right now.  The person who was giving him oxygen treatment in the hospital told me he didn't so I don't understand why he needs it now.  The problem here is that I question the doctor and their treatment plan for my son and because I do[,] the hospital thinks I'm the problem. . . .  I personally saw that [D.V.] was able to drink [one ounce] on his own.  Just because he started coughing[,] they stopped.  I think it's normal for a baby to cough[,] don't you?"

A Regional Center employee reported to DCFS that the last time Mother reached out to them was on March 21, 2018.  The employee reported that Mother had poor follow-through and expressed some measure of denial about her needs.  A DCFS social worker who worked with Mother in 2018 also reported that Mother did not comply with the court's orders and did not follow up with the Regional Center.

Mother began individual therapy on April 15, 2020, and had attended eight sessions of parenting education as of June 25, 2020.  Father began individual counseling and had participated in four counseling sessions.  Father attended 10 parenting classes, during which he was observed to be very committed.

On April 24, 2020, the health officer for the Los Angeles County Department of Public Health issued an order limiting public access to health care facilities and mandating procedures to slow the transmission of Covid-19.[7]

_____

[7] See County of Los Angeles Department of Public Health, *Order of the Health Officer for Control of Covid-19* (Apr. 24, 2020) http://publichealth.lacounty.gov/media/coronavirus/docs/HOO/HO

On June 18, 2020, D.V. was reported to still be G-tube dependent. He continued to require oxygen treatment via a nose cannula at night and "as needed" during the day. He also continued to require numerous medications and follow-up care with medical care providers, including specialists in neurology, cardiology, endocrinology, ophthalmology, and the gastrointestinal/nutrition department.

**G.    The Jurisdictional and Dispositional Hearing**

At the July 8, 2020, jurisdictional and dispositional hearing, the juvenile court stated that its tentative ruling was to sustain count b-1. The court found that "we have a child with severe medical needs in which the parents have, one, failed to recognize his healthcare needs; and, then, two, failed in the medical training to provide the health care needs for the minor child." In reaching this determination, the juvenile court observed that Mother had a history of inadequate supervision of minor children. Further, comments by the hospital staff demonstrated the parents lacked comprehension of D.V.'s medical needs. Mother and Father not only continuously challenged the conclusions of the medical professionals, but also demonstrated they did not understand D.V.'s required care by repeatedly asking the same questions. Both parents failed the required medical training, and Mother failed to enroll in Regional Center services as recommended by DCFS.

Mother and Father argued that they understood D.V.'s medical needs; DCFS did not make efforts to re-train them; and DCFS did not demonstrate that Mother and Father could not

O_Coronavirus_LicensedFacilities_04.24.20.pdf [as of Jan. 28, 2021].

18

pass the 12-hour training if it was administered a second time. Instead, DCFS "created a situation where the parents cannot even engage in this second 12-hour test because they ceased all in-person contact with the child." Mother also argued that DCFS failed to carry its burden to show there were no reasonable means to prevent removal because, for example, an after-care in-home caregiver was available who would have made removal unnecessary. Father's counsel acknowledged that Covid-19 "caused a lot of problems for everybody and especially [DCFS]," but argued DCFS's efforts were inadequate nonetheless.

The juvenile court adopted its tentative ruling, sustaining count b-1 of the petition, finding "there are no reasonable means by which the child's physical health can be protected" without removal and that DCFS "made reasonable efforts to prevent removal but *there are no services available to prevent further detention*." (Italics added.) The court ordered D.V. removed from Mother and Father and suitably placed under the care and supervision of DCFS. Mother and Father were ordered "to complete parenting programs and to obtain medical training to meet the health care needs of the minor child."

Mother and Father timely appealed the July 8, 2020, dispositional order.

## DISCUSSION

### A. Legal Standard and Standard of Review

To remove a child from parental custody, the juvenile court must find by clear and convincing evidence that one of five grounds exists pursuant to section 361, subdivision (c). (*In re V.L.* (2020) 54 Cal.App.5th 147, 154.) Of relevance here, "[o]ne ground for removal is that there is a substantial risk of injury to the child's physical health, safety, protection or emotional well-

19

being if he or she were returned home, and there are no reasonable means to protect the child." (*Ibid.*, citing § 361, subd. (c)(1).)[8]

"A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] 'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.' [Citation.]" (*In re N.M.* (2011) 197 Cal.App.4th 159, 169-170.)

The clear and convincing evidence standard " 'requires a finding of high probability. The evidence must be so clear as to leave no substantial doubt.' " (*In re V.L., supra,* 54 Cal.App.5th at p. 154.) " '[W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. Consistent with well-established principles governing review for sufficiency

_____

[8] Section 361, subdivision (c)(1) provides: "A dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances . . . : (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's physical custody . . . ."

20

of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence.' " (*Id.* at p. 155 [applying the standard of review articulated in conservatorship matters to a dependency proceeding], quoting *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996.)

Section 361, subdivision (e) also requires the juvenile court to "make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home."

## B.   Substantial Evidence Supports the Juvenile Court's Dispositional Order

Mother and Father argue that DCFS and the juvenile court failed to make reasonable efforts to prevent removal and thus, the juvenile court could not find by clear and convincing evidence that there were "no reasonable means" by which D.V.'s physical health could be protected without removal. As explained below, we disagree with each of their arguments.

1.   *Clear and Convincing Evidence Supports the Juvenile Court's Finding of a Substantial Danger to D.V.'s Physical Health*

In issuing its order for removal, the juvenile court first had to find by clear and convincing evidence "that there is a substantial risk of injury to [D.V.'s] physical health" if he were to be released to Mother and Father's care. (*In re V.L.*, *supra*, 54 Cal.App.5th at p. 154; see § 361, subd. (c)(1).)

21

As a preliminary matter, it is important to acknowledge that due to D.V.'s age and the nature of his medical conditions, he was subject to an ongoing risk of substantial danger to his physical health. To prevent such danger, it was essential for his parents to be vigilant in their attentiveness to his daily medical needs, and to properly execute the procedures necessary to address those needs.

We first address Mother's argument that her prior child welfare history did not support a finding of a substantial danger to D.V.'s physical health if he were released to Mother and Father's care.

Mother's prior child welfare history demonstrated Mother's lack of attentiveness to the needs of her children. In May 2017, her toddler, F.D., escaped Mother's home and wandered near a busy street. DCFS advised Mother of necessary steps to ensure F.D. did not leave the apartment unattended again. However, the next month, F.D. was found alone in a supermarket parking lot. The juvenile court was permitted to rely on this history as evidence that Mother would not be sufficiently attentive to D.V.'s medical needs. (See *In re N.M.*, *supra*, 197 Cal.App.4th at p. 170 [in considering evidence of parental inability to provide proper care for a child for purposes of a removal order, "[t]he court may consider a parent's past conduct as well as present circumstances"].) However, this was not the only evidence upon which the juvenile court relied.

The record established that Mother and Father were incapable of meeting D.V.'s specialized medical needs. For example, medical professionals repeatedly voiced concern, based on their observations, that Mother and Father failed to comprehend how to properly care for D.V. Indeed, during their

22

12-hour training sessions in February 2020, Mother and Father made feeding tube errors, medication errors, and errors in administering oxygen, revealing that D.V.'s necessary care was too complex for either of them to manage adequately. Mother and Father also exhibited questionable judgment by failing to take action when D.V. gagged and when his nose cannula fell from his nose. Father demonstrated poor judgment by engaging in rough play with D.V.

Additionally, the evidence in the record demonstrated that Mother and Father repeatedly denied the extent of D.V.'s medical needs. Notwithstanding several educational and training sessions with the hospital, on April 16, 2020, Mother and Father continued to express doubt that D.V. could not be bottle fed safely or that he needed oxygen. On more than one occasion, they also accused the hospital of lying to them.

We also disagree with Mother and Father's argument that D.V.'s improved health at the time of the dispositional hearing weighed in favor of releasing him to the parents. The record does not show his improvement rose to such a level that his parents would have been capable of caring for him. Although D.V. no longer needed continuous oxygen during the day, he still required oxygen throughout the night and sometimes during the day. His other serious medical conditions persisted, and he required several follow-up appointments for specialized care with neurology, cardiology, endocrinology, ophthalmology and the gastrointestinal/nutrition departments.

Accordingly, clear and convincing evidence supported the juvenile court's determination that there was substantial danger to D.V.'s physical health if he were to be placed with his parents.

2.  *Substantial Evidence Supports the Juvenile Court's Finding That DCFS Made Reasonable Efforts to Prevent Removal*

Before ordering removal, the juvenile court must determine if "reasonable efforts were made to prevent or to eliminate the need for removal."  (§ 361, subd. (e).)

In addressing "reasonable efforts" in its May 11, 2020, jurisdictional and dispositional report, DCFS noted that at the detention hearing on March 11, 2020, the juvenile court found that reasonable efforts had been made to prevent the need for removal.  DCFS also noted that on March 11, 2020, Mother and Father were provided with "low/no cost service treatment referrals"; on April 16, 2020, a DCFS investigator interviewed both parents; on April 20, 2020, a DCFS investigator received D.V.'s medical records; and on May 5, 2020, a child and family team meeting was scheduled to take place via teleconference with the parents.[9]

Prior to the March 11, 2020, detention hearing, the hospital and DCFS made reasonable efforts on several occasions to educate and train Mother and Father about D.V.'s medical needs and how to care for him.  Between September 2019 and January 2020, the parents participated in at least four such educational and training sessions offered by the hospital to educate them about D.V.'s medical conditions, his past treatment, plans for his future treatment, and G-tube feeding.  (See *In re H.E.* (2008) 169 Cal.App.4th 710, 725 [DCFS is entitled to rely on services

_____

[9] The record does not reflect whether the child and family team meeting took place or what was discussed during the meeting.

24

provided by outside sources in demonstrating "reasonable efforts"].)

Thereafter, DCFS became involved and not only communicated with the hospital staff concerning the parents' progress, but also reinforced with the parents that it was important that they demonstrate they were capable of caring for D.V. For example, on January 30, 2020, DCFS met with Mother and inquired as to her progress relating to G-tube feeding training and her understanding that D.V. required oxygen. Mother responded that she would participate in another G-tube training. DCFS also reached out to Father after the HSW reported concern that Father was not adequately engaged in training. Father thereafter confirmed he would participate in future trainings.

After D.V. underwent the G-tube procedure, on February 12 and 13, 2020, a nurse demonstrated G-tube feedings and medication administration for Mother and Father.

Then, on February 16, 2020, the hospital hosted another G-tube training session for the parents. On February 18, 2020, each parent participated in a 24-hour hands on training session, during which a nurse prompted them on how to care for D.V. Shortly thereafter, each parent also participated in a 12-hour independent care training session.

Notwithstanding each of these sessions, Mother and Father argue "reasonable efforts" to train them were not made because during the four months between the detention hearing on March 11, 2020, and the dispositional hearing on July 8, 2020, DCFS did not facilitate further training related to D.V.'s medical needs. However, due to the Covid-19 pandemic and governmentally-mandated social distancing, DCFS limited its in-

25

person services, and the Governor and the Los Angeles County Department of Public Health issued orders requiring healthcare facilities to limit or prevent non-essential access. As Father's counsel acknowledged, Covid-19 "caused a lot of problems for everybody and especially [DCFS]." Considered in context, at a time when an unprecedented global pandemic was causing wide-spread disruption to delivery of health care and other essential services, we cannot find it was unreasonable for DCFS or the medical professionals to delay in providing further in-person training prior to the July 8, 2020, dispositional hearing.

Mother and Father suggest training could have been provided by video. The evidence, however, demonstrates that remote training would have been inadequate to ensure Mother and Father were capable of providing D.V. with the care he required. Throughout their prior in-person training, Mother and Father seemed to comprehend what was told to them. However, when it came to personally executing tasks necessary for D.V.'s care, they lacked the knowledge and skills to do so. As Mother's counsel acknowledged at the dispositional hearing, the 12-hour training "necessitate[s] contact with the child." Moreover, given their history of making errors in caring for D.V., Mother and Father not only required training, but an opportunity to demonstrate in a hands-on environment that they could properly care for D.V. Mother and Father have not shown that doing so by video would have been adequate.

Reasonable efforts to prevent removal "need only be reasonable under the circumstances, not perfect." (*In re H.E., supra,* 169 Cal.App.4th at pp. 725 [tribal social worker facilitated numerous services and made reasonable efforts to arrange a psychological evaluation, which could not be timely completed

26

due to a lack of funding sources]; cf. *In re Ashly F.* (2014) 225 Cal.App.4th 803, 809-810 [finding removal was not supported by substantial evidence where DCFS did not describe the reasonable efforts it pursued to prevent removal, and the record contained evidence of reasonable means that could have been considered].) The record contains substantial evidence supporting the juvenile court's finding that reasonable efforts had been made to provide the medical training required to permit the parents to care for D.V. in the home.

      3.    *Clear and Convincing Evidence Supports the Juvenile Court's Finding That No Reasonable Means Were Available to Prevent the Need for Removal*

Finally, in ordering removal, the juvenile court was required to find by clear and convincing evidence that there were "no reasonable means" to protect D.V. absent removal. (§ 361, subd. (c)(1).)

Mother and Father argue assistance from the maternal grandmother or an in-home nurse would have obviated removal. However, Mother and Father have not demonstrated the maternal grandmother or an in-home nurse could have provided sufficient assistance. Although the maternal grandmother was supportive of Mother, she lived in Las Vegas, Nevada, and there was no indication that she intended to move. There is no evidence the maternal grandmother would have proved proficient in addressing D.V.'s complex medical needs. As to the in-home nurse, the HSW made provisions for an eight-hour in-home nurse, leaving 16 hours each day when the parents would have been solely responsible for D.V.'s care. There is no evidence to suggest that it would have been feasible or reasonable to provide D.V. with a 24-hour, seven-days-a-week, in-home nurse,

27

especially given the limitations and strain on healthcare resources caused by the Covid-19 pandemic.

Further, the juvenile court's order removing D.V. from his parents was premised in part on Mother's and Father's denial of D.V.'s specialized medical needs. As described above, notwithstanding multiple educational and training sessions, in April 2020, Mother and Father continued to doubt the medical professionals and believed they had a better understanding of D.V.'s medical needs than the professionals did. The record amply demonstrates reasonable efforts by DCFS and the medical professionals to correct Mother's and Father's erroneous opinions. Despite all the counseling they received, they remained unable to understand or acknowledge the gravity of D.V.'s medical needs.

At the time of the dispositional hearing, due to the conditions related to the Covid-19 pandemic, it was not feasible to provide the parents with further in-person medical training to ensure D.V. would be safe in their care. The parents had demonstrated they were not capable of providing the complex medical care D.V. required. The record as a whole contains substantial evidence from which a reasonable fact finder could find it highly probable that D.V. faced a substantial danger to his physical health, and that there were no reasonable means to protect him absent removal.

## DISPOSITION

The juvenile court's July 8, 2020, dispositional order is affirmed.

NOT TO BE PUBLISHED


FEDERMAN, J.*


We concur:


CHANEY, J.


BENDIX, Acting P. J.

---

*Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.