Filed 4/20/21  In re Camila S. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
## SECOND APPELLATE DISTRICT
## DIVISION THREE

| | |
|---|---|
| In re Camila S., et al., Persons Coming Under the Juvenile Court Law. | B307598 |
| _____ | (Los Angeles County Super. Ct. No. 19CCJP00060A-B) |
| LAURA F., | |
| Petitioner, | |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for extraordinary writ to review order of the Superior Court of Los Angeles County, Martha A. Matthews, Judge.  Petition denied.

Law Office of Rachel Ewing, Bernadette Reyes and Erin Lovelance, for Petitioner.

No appearance for Respondent.

Rodrigo Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, for Real Party in Interest.

———————————————

Laura F. (mother) filed the present petition for extraordinary writ challenging the juvenile court's order terminating her reunification services and setting a Welfare and Institutions Code[1] section 366.26 hearing as to her two youngest children, Camila S. (born in April 2006) and Sofia (born in October 2011). Mother's sole contention in this petition is that the juvenile court erred in finding she was provided reasonable reunification services by the Los Angeles County Department of Children and Family Services (DCFS). We conclude that the juvenile court's finding is supported by substantial evidence, and thus we will deny the petition.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. *The Initial Investigation*

The family first came to DCFS's attention in November 2013 after a caller alleged the family was living in unsanitary conditions. According to the caller, the children had "very poor hygiene [and] dirty clothing," and the family's home was full of

———————————————

[1] All subsequent undesignated statutory references are to the Welfare and Institutions Code.

[2] Sections A–C of this section are taken from our prior opinion in this case, *In re C.S.* (Dec. 31, 2019, B297668) [nonpub. opn.].

2

flies, cockroaches, dirty dishes, and dirty clothes.  Between July 2014 and October 2017, DCFS received four more referrals, most of which were based on the unsanitary conditions in which the family was living.

In October 2018, DCFS received another referral based on the family's living conditions.  The family was living in the garage of a house owned by a relative.  Although the house was clean, the garage was "horrid."  The family slept on two queen-sized mattresses on the floor.  The garage had electricity and a portable stove, but it lacked a bathroom and kitchen.  The refrigerator was stocked with food, some of which was spoiled, and there was spoiled food left out on the portable stove.  The garage was poorly lit because it lacked interior lighting and all the windows were blocked, and it was "very dirty," smelled "very strongly of urine," and was infested by cockroaches.

A DCFS social worker who inspected the family's home advised mother she needed to clean the garage "thoroughly," including scrubbing the floors, disposing of any spoiled food, and clearing out the items blocking the windows.  If mother could not improve the condition of the garage, the social worker advised her to find "another location to provide the children with better living conditions."

The referral also alleged that Camila went to school with dirty clothes, had a strong odor of urine on her body, and had had lice in her hair for "a very long time."  Camila's teachers were struggling to include Camila in group assignments because the other students complained about her poor hygiene.  On one occasion, when she was in the assistant principal's office, Camila opened her binder and cockroaches came out of it.  Camila had

missed 15 out of 57 days of school, and she was always late to her first period class.

The school's nurse reported that Camila often complained about pain in her "private area" when she urinated. Although Camila had been diagnosed with a urinary tract infection and had been provided medication by her doctor, the school believed her parents were not following through with the prescribed treatment or taking her back to the doctor when the infection recurred. The school had referred Camila to the Public Health Clinic, and it provided mother referrals to other family-assistance resources, but mother never followed up on them. According to the nurse, "mother does not do much for the children[,] and she also appears unkempt."

In early December 2018, DCFS scheduled a medical and mental health evaluation for Camila. Mother and Camila showed up to the appointment an hour late, so the clinic was able to perform only a mental health evaluation of the child. The clinical supervisor who evaluated Camila was concerned about the family's well-being. Camila showed up to the evaluation with poor hygiene and dirty clothes, even though the appointment was early in the morning. Mother told the supervisor that 12-year-old Camila frequently "wet[] the bed," had constant ear infections, and missed a lot of school due to illness. Based on her evaluation of Camila, the supervisor believed the child did not shower or change her clothes after wetting her bed at night. The supervisor advised mother that Camila should receive mental health services to address her bed-wetting. The social worker later referred Camila to mental health services and instructed mother to follow up on scheduling an appointment for the child.

4

In late December 2018, mother told DCFS that the family had been evicted from the relative's garage and was living with mother's adult daughter. Mother asked DCFS to "open" a case so that the family could receive housing benefits and other "resources" to help mother find a job.

B.     *The Dependency Petition*

On January 4, 2019, DCFS filed a dependency petition under section 300 on the children's behalf. As later sustained by the court, the petition alleged:

b-1: "[M]other . . . and father . . . have failed to follow up and ensure that [Camila] received necessary medical care for the child's urinary tract infection despite the child's continued complaints. Such failure to ensure that the child received appropriate medical care places the child[] and the child's sibling[,] [Sofia,] at risk of serious physical harm."

b-2: "On 10/25/18 and on prior occasions, the children['s] . . . home was found to be in a filthy and unsanitary condition. On prior occasions, the children were observed to have poor hygiene. The mother . . . and father . . . have failed to address the filthy and unsanitary home condition and the children's poor hygiene despite being provided with resources and referrals to alleviate the conditions. The mother and father's failure to address the unsanitary home condition and children's hygiene issues[] place the children at serious risk of physical harm."

At the initial hearing on the children's petition, the court found DCFS alleged a prima facie case under section 300. The court allowed the children to remain in their parents' custody and ordered DCFS to provide mother referrals for housing assistance.

C.    *The Family's Conduct After the Filing of the Dependency Petition*

In mid-January 2019, Camila received a medical exam. The doctor who evaluated Camila noted the child was "obese" and needed to visit a dentist "ASAP." The doctor also noted that Camila had head lice.

As of early February 2019, the family's situation had not improved. The office manager from Camila's school reported that Camila continued to miss a lot of school. In a three-week period following winter break, Camila had attended only seven days of class. The school district's Homeless and Foster Liaison reported that she had been working with the family for three years, but that "this is the worst [the family] has ever been." According to the liaison, Camila and Sofia " 'don't go to school at all and have every illness possible.' " The school district was having difficulty creating an individualized education program for Camila because her parents rarely took her to school.

Camila also continued to have poor hygiene. The child would urinate on herself at school, and other students would "make faces" at her because of her foul body odor. Camila's poor hygiene prevented her from having any friends at school. The Homeless and Foster Liaison reported that father also had poor hygiene and was usually " 'extremely dirty.' "

The Homeless and Foster Liaison didn't know whether mother was using drugs, but she reported that mother's stories "do not make sense." The liaison had referred Camila to therapy, but mother never followed through on the referrals. The liaison told DCFS's social worker, " 'I don't know what else to do, we have provided the mother with clothing, shoes, gift cards,

6

groceries, beds, mattresses . . . and the mother's situation is the worst it's ever been.' "

The school's nurse reported that she had recently made an appointment for Camila to see a doctor at a medical clinic, but mother never took Camila to the appointment. The nurse also provided mother several referrals for other "resources," but mother never followed up on them.

The psychologist from Camila's school reported that mother and father had attended two meetings for a special education assessment for Camila. During the first meeting, mother and father left after only 10 minutes, telling the psychologist they had "other things to do." During the second meeting, mother and father started fighting and left after only a few minutes. Mother and father did not show up for the third meeting. According to the psychologist, mother and father were "disheveled" and one of them had a "strong smell of urine." The psychologist doubted whether mother and father were capable of caring for Camila and recommended that both parents drug test.

DCFS also interviewed the family and some of its relatives. Father admitted that the family was still living in the garage, even though mother had reported they no longer lived there. Father also knew that Camila frequently urinated and defecated in her clothes. When father told Camila she needed to use a toilet whenever she felt the urge to go to the bathroom, Camila responded that she "cannot feel when she soils herself." Father explained he would send Camila to school in soiled clothing out of "laziness," because it was "easier to send her to school than to ask her to bathe."

Another relative, who wished to remain anonymous, told DCFS that the children bathed about once every three weeks.

Mother and father did not provide the children toilet paper, which the relative believed is why the children always smelled like urine and feces and why Camila contracted so many urinary tract infections. The relative also believed mother and father used methamphetamine and that mother had been hospitalized due to withdrawals from the drug.

In late February 2019, DCFS detained Camila and Sofia from their parents' custody and placed them in foster care.

D. *The Jurisdiction and Disposition Hearing*

The court held a jurisdiction and disposition hearing on April 9, 2019. The court sustained counts b-1 and b-2 of the petition, declared Camila and Sofia dependents of the court, and ordered the children removed from their parents' custody.

Although the court noted the strong bond between the parents and children, it found that removal was necessary because "long-term neglect is harmful to children, even children who obviously love their parents. Their basic needs have not been met for a really long time, and it's still not entirely clear what the underlying issue is." The court acknowledged the possibility that mother required some mental health support, but noted that "if, in fact part of the solution is that mother needs to obtain some form of mental health treatment, that's going to take a while." The court also noted that neither parent had shown up for drug testing, "[a]nd there is a question in the case whether substance abuse is part of what is going on. . . . I don't know, because the parents didn't test. So I don't know if that's an issue or not."

The court noted that although both Camila's school and DCFS had made significant efforts to help the family achieve cleaner living conditions, improve Camila's health, and ensure

8

Camila regularly attended school, mother and father "were really hard to reach and hard to get them to follow up. So the same thing keeps happening." Speaking directly to the children, the court said: "I know that you want to go home, but I can't let you go home today. Because my job is to make sure that you are safe and your needs are met. And I don't seem to be able to make that happen in your parent's house, and I don't understand why. So I need to figure out what's going on so that things get better."

The court ordered both parents to submit to 10 random or on-demand drug tests, and if they missed any tests or tested positive for any illicit substances, to participate in a full drug-treatment program. The court further ordered mother to submit to psychological and psychiatric assessments, participate in mental health counseling, and follow her psychologist's recommendations. Both parents were granted monitored visits with the children.[3]

### E. Six Month Review Period

#### 1. The Children's Progress in Foster Care

The children were placed in foster care in February 2019. In August 2019, DCFS reported that the foster mother was working closely with the children to improve their hygiene. Both children had been treated for head lice, which had been so extreme when the children entered foster care that lice could be seen across the children's foreheads. Then thirteen-year-old Camila was continuing to struggle with bladder and bowel

---

[3] Father appealed from the jurisdiction and disposition orders, urging that there was insufficient evidence the children would be at risk of harm in the parents' custody, and DCFS had not made reasonable efforts to prevent the children's removal. We affirmed. (*In re C.S.,, supra*, B297668).)

incontinence, but her accidents had decreased from daily to two or three times per week. The foster mother "has been very understanding and patient" with Camila's toileting issues, and had taught her to rinse her clothes and shower after an accident. Both children had received dental care, Camila had been referred to an orthodontist, and Sofia had received treatment for two infected teeth. Camila had been seen by an audiologist, who diagnosed some hearing loss in both ears. Camila reported she had a lot of ear infections and was supposed to have had tubes placed in her ears, but never did.

The children had opened up to the social worker about the conditions in which they had lived with their parents, admitting that the garage where they lived was very dirty, and that they had eaten primarily fast food because mother did not prepare any meals. The parents had been aware of Camila's encopresis (bowel incontinence), which Camila said was embarrassing to her.

Camila told the social worker she was happy she no longer had daily bathroom accidents. Her self-confidence appeared to be improving and she was asking to spend time with school friends. She admitted that when she lived with her parents, she was teased because she wore the same clothes and shoes to school every day. Both children had been obese when they entered foster care, but were learning to eat healthy meals and exercise.

2. <u>The Parents' Partial Compliance with Their Case Plans</u>

In August 2019, mother and father reported living in a motel, but continued to have poor hygiene, wear dirty clothes, and smell of urine. Mother was not working and had not drug tested, enrolled in counseling, or enrolled in drug treatment. She

repeatedly expressed concern about the care the foster mother was providing the children; for instance, when Sofia showed mother a dental filling, mother became upset and asked the child repeatedly whether the procedure had been painful. Mother also complained that the foster mother did not provide the children with enough food. Mother continued to deny having a dirty home and to minimize Camila's encopresis, saying that Camila simply forgot to use the restroom.

By September 2019, mother had enrolled in parenting classes and mental health services. A community health worker at the East San Gabriel Valley Mental Health Center said mother had been evaluated by a psychiatrist, but because mother had not signed a release, the worker could not disclose the results of the evaluation.

The social worker noted that during monthly meetings with the parents, the parents "constantly make allegations against the foster mother, rather than focusing on their case." When the social worker attempted to discuss the court's orders, mother appeared upset and said, " '[W]hy do we have to talk about that?' " The worker opined that mother had "not made any progress in mitigating the issues that brought her family to the attention of [DCFS], . . . ha[d] not made the nexus between her behavior and how it negatively affects her children[,] . . . [and] ha[d] not taken any accountability as to her actions and behavior."

3.     DCFS's Attempts to Schedule a Psychiatric Assessment of Mother

On May 17, 2019, the juvenile court appointed Dr. Nancy Kaser-Boyd to perform psychiatric testing of mother pursuant to Evidence Code section 730 and to recommend a "treatment plan

including medication assessment and appropriateness of current medication."[4]

Dr. Kaser-Boyd's assessment was not completed by the September 2019 receipt-of-report date. On September 4, 2019, the court directed the social worker or county counsel to "make sure that Dr. Boyd knows that, if possible, we should try and have her report on or before October 17th, and the worker should assist in scheduling the assessment as soon as possible, that way we won't have any further delay."

A social worker emailed Dr. Kaser-Boyd regarding the assessment on September 11, 18, 20, and 27, and on October 3 and 15, 2019. On September 10, 2019, Dr. Kaser-Boyd requested court reports, which the social worker provided the same day. Dr. Kaser-Boyd did not otherwise respond to the social worker's emails.

### F.    Six-Month Review Hearing

At the six-month review hearing on October 21, 2019, the court found that the parents were in partial compliance with the case plan, and DCFS had complied with the case plan by providing reasonable services. The court ordered reunification

---

[4]    Evidence Code section 730 provides in pertinent part: "When it appears to the court, at any time before or during the trial of an action, that expert evidence is or may be required by the court or by any party to the action, the court on its own motion or on motion of any party may appoint one or more experts to investigate, to render a report as may be ordered by the court, and to testify as an expert at the trial of the action relative to the fact or matter as to which the expert evidence is or may be required." (Evid. Code, § 730.)

services to continue for another six months, and set a 12-month review hearing for April 28, 2020.

> G.      *Twelve-Month Review Period*
>
>> 1.      <u>The Children's Progress in Foster Care</u>

During her eighth-grade year, while in foster care, Camila earned primarily A's and B's at school and began playing on her middle school's basketball team.  She had been assessed for an individualized education plan and was receiving language, speech, and academic services.  Her school's counselor reported Camila had made a lot of progress during the school year, was more outspoken, and enjoyed helping her teachers.

Camila's encopresis had improved dramatically, with the foster mother reporting none or one accident per week.  Her hearing had improved in both ears, and she was receiving regular medical and dental care.  She was receiving therapy weekly.

Sofia also had been assessed for an individualized education plan and was receiving assistance with language and speech.  She no longer had bathroom accidents at night.  She also received weekly therapy.

>> 2.      <u>The Parents' Partial Compliance with Their Case Plans</u>

Mother began meeting with a therapist in December 2019.  In February 2020, mother had a psychological assessment and was diagnosed with a mood disorder, but she declined psychiatric medication.

In April 2020, the therapist reported that she was working with mother to decrease depression and suicidal ideation, and to develop problem solving skills.  Mother was also working with a peer advocate who modeled appropriate behavior.  However,

13

mother failed to attend therapy for a month from late February to late March, and again between mid-July and mid-August.

In January 2020, the social worker confiscated six cell phones the parents had secretly provided the children. Mother had instructed the children to hide the phones and to call her at night when the foster mother was not around.

As of late August 2020, the parents had not disclosed where they were living. Mother said she and father had submitted rental applications, but had been denied. Mother was not working, had not drug tested, and had not enrolled in a drug program. The parents had been offered, but declined, bus passes. Mother also had failed to follow up with housing and employment referrals provided to her by her case manager.

### 3. DCFS's Additional Attempts to Schedule a Psychiatric Evaluation

The social worker contacted Dr. Kaser-Boyd by email on March 10, 2020. Dr. Kaser-Boyd asked the date of the next court hearing, but did not further respond. The social worker emailed Dr. Kaser-Boyd again on August 19 and 28, 2020, but received no reply.

### G. *12-Month Review Hearing*

At the 12-month review hearing, held September 1, 2020, DCFS recommended that mother's and father's reunification services be terminated. The children's counsel submitted on DCFS's recommendation.

Mother objected to termination, asserting that DCFS had not provided her with reasonable services because the section 730 psychiatric assessment ordered by the court had never been performed. Mother's counsel argued that the psychiatric assessment was "a crucial part of the court-ordered case plan

14

that the mother has not been able to complete." Counsel thus urged that mother should be granted an additional six months of reunification services.

Father also objected to termination, urging that he had not received reasonable services because most of the social worker's contacts had been with mother, not with father. He requested additional reunification services.

After hearing argument, the court found that the parents were in only partial compliance with their case plans, and found by clear and convincing evidence that DCFS had provided reasonable services and made reasonable efforts to return the children to a safe home. The court also found by clear and convincing evidence that there was not a substantial probability that the children could be safely returned to the parents' physical custody by the next review hearing because the parents had not made significant progress in resolving the problems that had led to the children's removal "and have not demonstrated capacity and ability to complete the goals of the case plan and provide for the children's safety, protection, physical and emotional well-being." The court therefore terminated the parents' reunification services and set a section 366.26 hearing for January 13, 2021.

With regard to reasonable services, the court acknowledged that a section 730 psychiatric assessment of mother had not occurred. The court found, however, that DCFS's failure to successfully follow up on getting the assessment was not enough to trigger a no-reasonable services finding. The court explained: "[T]he mother back in September of last year made it extremely clear to the social worker that she had no intention of complying with any case plan service. Mother tried to get the children re-placed by making allegations about the caregivers. It turned out

15

to be false.  Mother's conduct during visitation was problematic. She was talking about the case and saying negative things about the caregiver.  In April of 2000 there was an incident where mother and father gave the children six cell phones and told them to hide the phones.  If this was a case where mother's mental health condition was central to the case and the lack of [a psychiatric assessment] was really what was preventing a parent from successfully reunifying, then I would make a no reasonable services finding; however, the parents never complied with anything.  They never drug tested.  They never indicated any willingness to do any programs at all, and their behavior, while uncooperative, [gave] really no indication that mother was suffering from some serious undiagnosed mental health condition that was preventing her from reunifying.

"In fact, in February, she does get an assessment and is prescribed medication, which she then decides not to take. Although certainly the services in this case were not perfect, . . . I just don't think the [psychiatric assessment] was central enough to this case to warrant a no-reasonable-services finding."

H.     *The Present Petition*

Mother filed a notice of intent to file a writ petition on September 2, 2020, and filed a request for stay of the section 366.26 hearing on January 11, 2021.  On January 11, 2021, this court granted a temporary stay, and on February 11, 2021, we issued an order to show cause why the petition should not be granted.

## DISCUSSION

Mother contends the juvenile court erred in terminating her reunification services because she was not provided with reasonable services.  For the reasons that follow, we conclude

16

that mother's reunification services, although not perfect, were reasonable under the circumstances, and we therefore will deny the petition.

### A. Legal Principles

Subject to exceptions not relevant here, the juvenile court is required to provide reunification services whenever a child is removed from parental custody. (§ 361.5, subd. (a).) The purpose of such services is to "eliminate the conditions leading to loss of custody and facilitate reunification of parent and child. This furthers the goal of preservation of family, whenever possible." (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 478.)

At the 12-month review hearing, the court must return the child to her parents if it is safe to do so. (§ 366.21, subd. (f).) If the child cannot be safely returned home, the court shall terminate the parent's reunification services and set a hearing to terminate parental rights unless the court finds either that the child is likely to be returned home by the 18-month hearing, or that "reasonable services have not been provided to the parent." (§ 366.21, subd. (g)(1).) A reasonable services finding shall be made by clear and convincing evidence. (§ 366.21, subd. (g)(4).)

"We review a reasonable services finding ' "in the light most favorable to the trial court's order to determine whether there is substantial evidence from which a reasonable trier of fact could make the necessary findings based on the clear and convincing evidence standard." ' [Citation.] In determining whether there is substantial evidence to support the court's reasonable services finding, we review the record in the light most favorable to the court's finding and draw all reasonable inferences from the evidence to support the findings and orders. We do not reweigh the evidence or exercise independent judgment, but merely

17

determine whether there are sufficient facts to support the findings of the trial court. (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688–689.) The burden is on the petitioner to show that the evidence is insufficient to support the juvenile court's findings. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)" (*In re M.F.* (2019) 32 Cal.App.5th 1, 14, italics omitted.)

B.     *Analysis*

Mother does not dispute that DCFS provided most of the elements of her court-ordered case plan—namely, that she was offered drug-testing, individual counseling, housing and employment assistance, and frequent monitored visits with her children. She urges, however, that the court-ordered psychiatric evaluation was an essential component of her case plan, and that without an evaluation, "the juvenile court lacked the information necessary to determine the appropriate treatment plan needed for [mother] to successfully reunify with her children." She thus contends that DCFS's failure to ensure she received a section 730 psychiatric evaluation constituted a failure to provide reasonable services.

We conclude that substantial evidence supported the juvenile court's conclusion that mother received reasonable services. Reasonable services are services "designed to aid the parent or legal guardian to overcome the problems that led to the initial removal and continued custody of the child." (§ 366.21, subd. (f)(1)(A).) "In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)

18

"Reunification services need not be perfect. [Citation.] But they should be tailored to the specific needs of the particular family. [Citation.] Services will be found reasonable if [DCFS] has 'identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult." (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 972–973; see also *In re H.E.* (2008) 169 Cal.App.4th 710, 725 [reasonable services "need only be reasonable under the circumstances, not perfect"].)

In the present case, the problems that led to the children's removal were the unsanitary conditions in which the parents and children lived, as well as the children's untreated medical conditions, including chronic urinary tract infections, encopresis, ear infections, and head lice. DCFS provided extensive services for the family to address these problems, including medical and mental health treatment for the children, and housing, transportation, and employment assistance for the parents. DCFS also provided mother with case management and mental health counseling throughout the period of supervision to help her address any psychological issues that underlay her chronic neglect of the children. These services were narrowly tailored to the family's needs and were reasonable under the circumstances of this case.

It is true, as mother notes, that she was never assessed by Dr. Kaser-Boyd. However, mother appears to have been assessed by two other mental health professionals—by a psychiatrist at the East San Gabriel Valley Mental Health Center in June 2019, and by psychologist Dr. Daniel Son in February 2020. Although

19

it is not clear whether these assessments were undertaken pursuant to the court's order, they indisputably led to a mental health diagnosis—depression—which guided the psychological counseling mother received.

Significantly, a psychiatric evaluation is not an end in itself—it is a tool to determine whether the subject of the evaluation would benefit from services, such as mental health counseling or psychotropic medication. In the present case, mother received mental health counseling for at least nine months, and was prescribed—but refused—psychotropic medication. It therefore does not appear that mother would have received any additional benefit from a further evaluation by Dr. Kaser-Boyd.

We note finally that although the juvenile court believed in April 2019 that a psychiatric assessment was necessary to determine whether an underlying mental health condition was impeding mother's ability to reunify, the court was of a different opinion by September 2020. At the 12-month review hearing, the same juvenile court judge who ordered the psychiatric assessment determined that the lack of a psychiatric assessment did not require a no-reasonable-services finding because there was "really no indication that mother was suffering from some serious undiagnosed mental health condition that was preventing her from reunifying." The juvenile court's assessment is borne out by the record: During the more than 18 months that DCFS supervised the family, social workers never observed mother behaving in a way that suggested a serious underlying psychiatric or neurological issue.

For all of these reasons, substantial evidence supported the juvenile court's finding, by clear and convincing evidence, that

mother was provided reasonable services. We thus will deny the writ petition.

## DISPOSITION

The petition for extraordinary writ is denied. The stay imposed January 11, 2021, is lifted. This court's opinion is final forthwith as to this court pursuant to California Rules of Court, rule 8.490(b)(2)(A).

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

LAVIN, J.

EGERTON, J.

21