Filed 3/28/25  In re T.O. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re T.O., et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E084173 |
| Plaintiff and Respondent, | (Super.Ct.No. J293829, J293830, J293831, J293832) |
| v. | OPINION |
| D.O., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Affirmed.

Law Offices of Vincent W. Davis & Associates and Vincent W. Davis for Defendant and Appellant.

Tom Bunton, County Counsel and Dawn M. Martin, Deputy County Counsel, for Plaintiff and Respondent.

1

In this dependency matter, the juvenile court took jurisdiction over five minors and removed them from parental care. This appeal involves only the four older children and their father, not the youngest child or the mother of all five. The father argues there is no substantial evidence to support removing his children from him. In his view, he should be deemed a non-offending parent and his children should be placed in his care. We affirm the challenged findings and orders.

FACTS

Defendant and appellant De.O. (father) has four children, all boys, with R.H. (mother): D.O. (born June 2015), G.O. (born Jan. 2017), S.O. (born June 2018), and T.O. (born Mar. 2019). In June 2022, their infant half-sister F.H. (born Feb. 2022) was hospitalized for "failure to thrive." Doctors subsequently "ruled out any medical reasons" for the infant's health issues, and changed the diagnosis to "severe malnutrition due to inadequate intake," possibly caused by neglect by mother. During this period, mother and father already had an open family law matter to establish a visitation schedule; father told the social worker mother "only wants him to have the boys every other weekend," but he "wants to see his children more than that." In July 2022, plaintiff and appellant San Bernardino County Children and Family Services (the department) obtained a warrant to detain all five children from mother, and it placed the four boys in father's care.

In dependency petitions filed July 20, 2022, the department alleged the children come within Welfare and Institutions Code section 300, subdivision (j), because their

sister suffered severe malnutrition while in mother's care.[1]  The next day, the juvenile

court detained the children from mother and ordered the boys to remain in father's

custody.  At the jurisdiction hearing, held after several continuances in October 2022, the

court sustained the dependency petitions, removed the boys from mother and placed them

with father.  It ordered family maintenance services for father and reunification services

for mother.[2]

In an April 2023 status report, the department recommended the children be

"jointly maintained" by mother and father, and that "the dependency matter be

continued."  The department "believe[d] the matter could be ready for dismissal in three

months," explaining that mother had made significant progress on her case plan.  Father

had opposed mother having unsupervised visits, including overnight and weekend visits;

he was "not in agreement with the case moving so rapidly in the mother's favor."  The

visits were held over father's objection, however, and the department found they had

been appropriate.

Father's behavior had raised some concerns.  He had been uncooperative by

dropping the children off late for visits, holding them in the car, and being argumentative

with mother.  The department also received "several anonymous messages" reporting

father "driving around the neighborhood" and talking to neighbors in an attempt to "spy

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

[2]  After this point, we use "children" to refer to the four boys, and not their younger half-sister.

3

on [mother]." Father told the social worker it "is not fair he does all the work for the children" while mother "has no responsibilities," and he "indicated he does not have to follow the court orders."

The social worker observed the children seemed to "have a difficult time comprehending why they have been uprooted from their home" and were living with their father. They "asked why they share a room with their step siblings, and have said that some of their big brothers are mean to them, hit them." They said when this happens they tell their stepmother, because their father "has lots of jobs" and "is always at work."

At the April 2023 status review hearing, father's counsel asked that the dependency be closed because the children were not at risk in father's care and the parents' custody dispute could continue in family court. The department asked that it remain open, noting the social worker's opinion that father had been interfering with mother's reunification. The court ordered the dependency case to remain "open in family maintenance with the parents to share equal time."

In August 2023, mother sought a temporary restraining order against father. She alleged father had "harassed" her since the dependency began. He would follow her as she went into and came out of the department's parking lot for supervised visits, including "with the kids in the car." When unsupervised visits were authorized he "started driving by [her] house." He called her neighbors "asking them questions" about mother and requesting they "report to him if they saw anything." A few weeks earlier,

4

she "found an apple air tag in our son's shoe" and realized father had been tracking their location.

The juvenile court denied the temporary restraining order request, finding "no immediate threat to physical safety," but set the matter for hearing. At the hearing, too, the court declined to issue a restraining order. Instead, it issued a series of orders in the dependency, including that the children may not have on them a tracking device when going to the other parent's home, that the parents must not disparage one another or discuss the dependency case with the children in any way, and that custody exchanges will be made inside the local police station. The court also authorized re-referrals to coparenting therapy.

In an October 2023 status report, the department again recommended the children be jointly maintained by both parents and the dependency case be continued. The parents were employed, they were communicating through the "Talking Parents" app, and they had participated in joint coparenting therapy. They still were having "a very difficult time being amicable" with each other, let alone coparenting. Their coparenting therapist recommended that father "participate in individual therapy in order for the couples therapy to be a benefit." The social worker observed the parents' uncooperative and "petty" behavior toward each other was "affecting their children," and the children said "they do not like it" when the parents say "yucky things" about the other parent. The children said that their stepbrothers were sometimes mean to them when they were at

5

father's house, and that their father and stepmother would "ask questions about what their mommy was doing and who was at her house."

At the October 2023 status conference, the court ordered joint family maintenance for the parents, and ordered them both "to do individual counseling again and then do coparenting" therapy. The court reiterated its prior orders about making disparaging remarks about one another, and that custody exchanges were to be done inside the police station. It also ordered the parents to refrain from any corporal punishments. The court found April 2024 was the likely date by which the permanent plan of returning the children home to the parents would be completed. It warned the parents, however, that they needed to "work together" for that to happen, and continued failure to do so could lead instead to removal.

In January 2024, the department obtained a warrant to remove the children from both parents and filed supplemental dependency petitions for each of them, based on physical abuse by mother and coaching and emotional abuse by father. The petitions alleged all four children came under section 300, subdivisions (b)(1) and (c) because the children were suffering serious emotional damage or at risk of such emotional damage by being "exposed to an unrelenting struggle between the parents, in their ongoing custody dispute." The department further alleged S.O. came within subdivision (a), and the other three came within subdivision (j), based on mother striking S.O. with a closed fist. The department alleged the previous disposition of family maintenance was no longer appropriate because of mother using inappropriate physical discipline methods and

6

violating court orders prohibiting any corporal punishment, and both parents putting the children "in the middle of a custody dispute causing emotional stress."

Mother denied punching S.O. and said she used timeouts for discipline. Her version of the events leading to the removal was that on January 6, 2024, S.O. told her he had a toothache, and a babysitter then reported the child had a fever. S.O.'s cheek was swollen, but there was no bruising. Mother arranged for S.O. to be taken to urgent care (she was working), where he was diagnosed with a tooth infection and prescribed antibiotics. She said she sent the prescription to father along with documentation when the children returned to father's home on January 8, 2024. Mother provided the social worker with medical documentation of the urgent care visit and prescription. It was mother's understanding that father took S.O. to the dentist and for an x-ray, as urgent care had recommended. Mother understood that S.O. had "soft tissue damage . . . that could have been caused by him chewing on his cheek."

Father, on the other hand, said S.O.'s cheek was not only swollen, but also bruised, when he returned home on January 8, 2024. Father said S.O. told him mother "punched him in the face for stealing candy." He said the dentist "took x-rays and stated S.O. did not have any signs of a tooth infection," and that there was "'soft tissue damage' that was consistent with being hit in the face." Father said, however, that "the computers were down, so he was unable to obtain documentation." Father provided the social worker with photos of S.O.'s face showing swelling on his right cheek. At least one of the photos, however, had been altered to make the swelling appear worse, which was

7

noticed because father sent both the original and the altered version to the social worker. Father also provided the department with a video of himself and S.O., in which father was "asking leading questions and the child repeating what the father says."

Several social workers interviewed the children on different occasions. S.O. told one of them on January 16, 2024, that mother sometimes would punish him for breaking rules by putting him in the garage. He said that mother had taken him to the garage and punched him once with a closed fist when he "got in trouble for fighting swords with [T.O.] and for sneaking candy." S.O. "denied any previous incident of physical discipline to himself or his siblings." D.O. said he was told by his stepmother that S.O. "got punched in the face for not listening," but did not witness the incident. D.O. said mother never hit him, but he had seen her "spank [G.O.'s] butt." G.O. did not see mother hit S.O., and said "his mother 'would never' hit him." T.O. said mother was "'so rude'" to him and described her hitting him on his hand "when they do not want to clean up." T.O. said mother "hits 'the other boys too.'"

A second social worker believed that father was coaching and emotionally abusing the children. She said that when she saw S.O. on January 7, 2024, mother told her S.O. had been to the doctor because of a toothache. The social worker observed S.O.'s cheek was swollen, but did not see any bruising. When she saw the children again on January 12, 2024, the children were withdrawn and not behaving normally; they "were cold and looked terrified," and they were "normally hyperactive and warm." She "found it odd that when she told [D.O.] hi, he blurted out, 'My mom spanked my brother and punched

8

him in the face, and they were in the garage.'"  The children also told her that at father's house they were not allowed to call mother "mom," and instead had to call her by her first name.  T.O. also said his father and stepmother told him mother is "'bad.'"

The juvenile court detained the children from both parents, and ordered visits suspended until forensic interviews of the children could be completed, with supervised visits after that.  The children were placed with their maternal grandmother.

In a forensic interview, S.O. "did not disclose physical abuse to himself or anyone else."  He said he did not remember what had happened to his cheek, except that he had been at mother's house and it "'kind of hurted.'"  When "prompted about [S.O.'s] face," the other three boys each said S.O. had rubbed his own face, causing it to turn red.  D.O., however, described one time he saw mother spank G.O. with her hand on his buttocks when she was "'super mad'" at him, and recalled being spanked himself on one occasion, leaving a red handprint on his buttocks.

Father told the social worker he believed counseling had been beneficial and he "received several tools he can utilize[] to have a successful amicable relationship with" mother.  The therapist conducting the joint coparenting counseling disagreed.  She told the social worker mother and father both "struggle[] with active listening skills, and effective communication," and that they "spend most of the sessions pointing out each other's contribution to the removal of the children."  The therapist had requested renewal of counseling services but did not believe it would be beneficial.

The maternal grandmother said the children were "adjusting slowly," and all were in therapy. She told the social worker that S.O. "self-injures," including by scratching his face hard enough to break the skin, rubbing his face with his fist repeatedly in the same place, pulling his own hair, falling, tripping, throwing himself on the floor, banging his head on toys, and banging his head on the wall. She described S.O. as having a difficult time playing with the other three boys. T.O. had been having extended tantrums that last over fifteen minutes. G.O. had become "very withdrawn" and distant, and the maternal grandmother reported the other children would "pick on" him.

A social worker who spoke to the children in March 2024 found them dressed appropriately and free of visible marks or bruises, and the children said they felt safe in the home and liked their new schools. They had not had contact with the parents since the January detention hearing. They told the social worker their father and stepmother "do not like" mother or get along with her, and that mother also does not like or get along with their father or stepmother. They said "their dad put a tracker in [G.O.'s] shoe and when they go back to their dad's house their dad and [stepmother] ask them questions about [mother] all day long." They "do not like that the parents do not get along and that they must answer questions about their mom." They asked when they could see their parents, and the social worker told them she would schedule a visit soon.

In an April 2024 report, the social worker described two visits for each of the parents as "appropriate," and both engaged with the children. The social worker observed the boys all were "looking for one-on-one attention from the parents." The

10

maternal grandmother told the social worker of three incidents where she believed father was waiting for her and harassing her after court hearings or visits. Father denied "any following or harassment" of mother or the maternal grandmother.

At the April 2024 jurisdiction-disposition hearing on the supplemental petitions, after off the record negotiations among the parties and the court, the juvenile court dismissed the new jurisdictional allegations. It found, however, that the children came within section 387, sustaining allegations that the previous disposition had not been effective in protecting the children, based on mother's use of physical discipline and both parents putting the children in the middle of their custody dispute, causing emotional distress. The court ordered the children removed from both parents, with both parents to receive reunification services. The court also ordered father and maternal grandmother to have no contact with each other.

DISCUSSION

Father argues there is no substantial evidence to support removing his children from his care. We are not persuaded.

"A section 387 supplemental petition . . . is used to change the placement of a dependent child from the physical custody of a parent to a more restrictive level of court-ordered care." (*In re D.D.* (2019) 32 Cal.App.5th 985, 989-990; see *In re T.W.* (2013) 214 Cal.App.4th 1154, 1161.)

"The hearing on a supplemental petition is bifurcated." (*In re D.D.*, *supra*, 32 Cal.App.5th at p. 990.) "The court first conducts an adjudicatory hearing at which it

11

must find by a preponderance of the evidence that the factual allegations of the supplemental petition are or are not true, and that the allegation that the previous disposition has not been effective is or is not true." (*Ibid.*) During this jurisdictional phase, the department "need not allege any new jurisdictional facts, or urge different or additional grounds for dependency because a basis for juvenile court jurisdiction already exists." (*In re T.W.*, *supra*, 214 Cal.App.4th at p. 1161.) "The only fact necessary to modify a previous placement is that the previous disposition has not been effective in protecting the child." (*Ibid.*)

"If the court finds that the allegations of a supplemental petition are true, it conducts a further dispositional hearing to determine whether there is a need to remove a child from his or her current level of placement." (*In re D.D.*, *supra*, 32 Cal.App.5th at p. 990.) In this phase, the juvenile court must find by clear and convincing evidence that the conditions for removal under section 361, subdivision (c), are met. (*In re T.W.*, *supra*, 214 Cal.App.4th at p. 1164; see *In re C.M.* (2017) 15 Cal.App.5th 376, 388 ["'The standard for removal on a supplemental petition is the same as removal on an original petition'"].) Conditions for removal include where "[t]here is or would be a substantial danger to the . . . emotional well-being of the minor" if the child were returned to the home, and there are no "reasonable means" to protect the minor without removal. (§ 361, subd. (c)(1); see *In re H.E.* (2008) 169 Cal.App.4th 710, 719-721 [substantial risk of emotional harm alone, without either risk of physical harm or already-caused emotional harm, can be grounds for removal].)

Generally, "[a] removal order is proper if it is based on proof of (1) parental inability to provide proper care for the minor and (2) potential detriment to the minor if he or she remains with the parent." (*In re T.W.*, *supra*, 214 Cal.App.4th at p. 1163.) "The parent need not be dangerous and the minor need not have been harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*Ibid.*)

"'We review an order sustaining a section 387 petition for substantial evidence.'" (*In re D.D.*, *supra*, 32 Cal.App.5th at p. 990.) We must "account for the clear and convincing standard of proof when addressing a claim that the evidence does not support a finding made under this standard," such as father's challenge here to the removal order. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011; see § 361, subd. (c).) Nevertheless, even in that context, our review is deferential to the juvenile court's role as trier of fact: "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable factfinder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.,* at pp. 1011-1012.)

The evidence here adequately supported removing the children from father. There was evidence, albeit disputed, from which it reasonably could be concluded father had

13

actively tried to undermine mother's relationship with the children. The most serious allegation of physical abuse against mother—punching S.O. in the face—may have been manufactured by father out of whole cloth, through a combination of coaching the children, his lies about observing bruising in addition to swelling, and an altered photograph; at the very least he tried to make S.O.'s swollen cheek seem worse than it was. Father repeatedly disparaged mother to the children, and he required them to use her first name instead of "mom," apparently attempting to alienate them from her. He interfered with mother's visitation, including by dropping the children off late, holding them in the car, and being argumentative and harassing in the children's presence. He tried to spy on mother by driving by her house during visits, hiding a tracking device hidden in a child's shoe, contacting her neighbors, and haranguing the children with questions. A reasonable inference from the record is that this behavior, combined with other factors, had caused the children emotional harm, as exemplified by S.O.'s self-harming, T.O.'s tantrums, and G.O. becoming withdrawn and distant. At the least, it was reasonable for the juvenile court to find it highly likely that father's behavior had placed the children at substantial risk of emotional harm.

It was also reasonable for the juvenile court to find there was no reasonable means to protect the children without removal. Father showed no signs of taking responsibility for his part in creating and maintaining the parents' animus toward each other, and their resulting failure to cooperate, let alone develop a functional coparenting relationship. He repeatedly violated court orders prohibiting the parents from disparaging each other or

14

talking about the dependency with the children, and he declared that he was not required to follow court orders. Coparenting therapy had been ineffective, both while the children were in father's care and after their removal.

In short, there was substantial evidence father engaged in behavior that either caused emotional harm or risked emotional harm to the children. That behavior, combined with father's lack of insight, provided an ample basis for the juvenile court's order removing the children from his care.

## DISPOSITION

The juvenile court's order removing the children from father is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL _____
J.

We concur:

McKINSTER _____
Acting P. J.

FIELDS _____
J.

15